994 P.2d 700 (2000)
Robert BYFORD, Appellant,
v.
The STATE of Nevada, Respondent.
No. 32207.
Supreme Court of Nevada.
February 28, 2000.
*704 David M. Schieck, Las Vegas, for Appellant.
Frankie Sue Del Papa, Attorney General, Carson City; Stewart L. Bell, District Attorney, James Tufteland, Chief Deputy District Attorney, and Christopher J. Lalli, Deputy District Attorney, Clark County, for Respondent.
BEFORE THE COURT EN BANC.

OPINION
SHEARING, J.:
In 1992, the State charged appellant Robert Royce Byford and two codefendants, Christopher Garth Williams and Todd Smith, with the murder of Monica Wilkins. Smith later pleaded guilty to one count of accessory to murder and agreed to testify against Byford and Williams. In 1994, Byford and Williams were found guilty by a jury and sentenced to death, but this court reversed their convictions and remanded for retrial due to violation of their Fifth Amendment right to remain silent. Murray v. State, 113 Nev. 11, 930 P.2d 121 (1997).
*705 After retrial, Byford and Williams were again convicted. Byford received a death sentence, and Williams a term of life in prison without the possibility of parole. Byford appeals on a number of grounds. We conclude that none warrant relief and affirm.

FACTS
Byford's second trial began in February 1998, at which time the following evidence was adduced.
Byford, Williams, and two teenage girls were visiting Smith at his parents' residence in Las Vegas on March 8, 1991. Byford was twenty years old, Williams seventeen, and Smith nineteen. Monica Wilkins, who was eighteen, called and told Smith she would pay him for a ride home from a local casino. Smith drove his jeep to pick Wilkins up, accompanied by Williams and one of the girls. After Smith picked up Wilkins and her friend, Jennifer Green, he asked Wilkins for gas money. Wilkins had Smith stop at a Burger King so that she could get some money. Williams went inside the store to see what was taking her so long, and Wilkins told him that she had gotten another ride. Smith and Williams were upset with Wilkins, and after they drove away, Williams fired a handgun out the window of the jeep.
Smith testified that Wilkins had angered him, Williams, and Byford before because she had invited them to her apartment to party but then left with other men. Byford and Williams had talked about "get[ting] rid of her" because she was always "playing games with our heads." Smith participated in the talk but took the threats as jokes.
Later that night, Smith, Williams, and Byford were together at Smith's house when Wilkins called again for a ride home. Accompanied by Byford and Williams, Smith drove to pick her up. Smith then drove all four of them to the desert outside of town to find a party that Byford heard was taking place. Wilkins told the other three that she had taken LSD earlier and was hallucinating. Smith drove to the usual area for parties, but they found no party. They then stopped so that everyone could urinate. Wilkins walked up a ravine to do so.
Smith testified to the following. As Wilkins finished, Byford handed Williams a handgun and said he "couldn't do it." Smith asked Byford what he was doing with the gun, and Byford told Smith to "stay out of it." Williams then shot Wilkins in the back three to five times. She screamed and fell to the ground. Wilkins got up, walked to Williams, and asked him why he had shot her. He told her that he had only shot around her. Wilkins walked up out of the ravine but then felt the back of her neck, saw that she was bleeding, and again confronted Williams. Williams told her that he shot her because she was "a bitch." He then walked behind her and shot her again repeatedly. Wilkins screamed and fell to the ground again. Byford then took the gun from Williams, said that he would "make sure the bitch is dead," and fired two shots into her head. Byford then got a can of gasoline from the jeep and poured it on Wilkins. Byford tried to hand a lighter to Smith and get him to light the gasoline, but Smith refused. Byford called him a "wussie" and lit the body. As it burned, the three drove off. As they returned to Las Vegas, Byford pointed the handgun at Smith and threatened to kill him if he ever told anyone.
Smith further testified that about a week after the murder, Byford and Williams had him drive them back to the desert to bury the body. An inmate who was incarcerated in jail with Byford and Williams after their arrest also testified that the two told him about this trip back to the body. They told the inmate that the body was decomposing and had maggots on it. Byford and Williams rolled the corpse into the ravine and partly covered it with a few shovelfuls of dirt.
After about two more weeks, the body was discovered by target shooters. Las Vegas Metropolitan Police Department investigators collected sixteen .25 caliber shell casings at the site; ballistic testing showed that all were fired from the same weapon. Ten .25 caliber bullets were recovered; five were in the body. Three bullets were in the chest and abdomen, and two were in the head. Either of the bullets in the head would have been fatal. The body was partly eaten by coyotes or wild dogs. Other bullets could *706 have been lost from the body due to this eating or the burning and decomposition of the body. The burning appeared to be postmortem.
In mid-April 1991, Byford's friend, Billy Simpson, was visiting Byford's residence. When the two came upon a dead rabbit covered with maggots, Byford told Simpson that he had seen maggots on a human body before. That same night, Simpson and his brother Chad observed Byford and Williams engage in "play acting" in which Williams acted as if he shot Byford with a gun, Byford fell and then stood back up, and Williams opened his eyes wide and pretended to reload and shoot him again. Byford and Williams explained that they had shot and killed Wilkins in the desert and then burned her body.
In the spring or summer of 1991, Byford conversed with two girls in a city park. He admitted to them that he and Williams had shot and killed a girl in the desert and then burned her body. He told them that he wanted to see what would happen when someone under the influence of "acid" was shot. In August 1991, Byford told another friend that he was a "bad person" and "had done evil things" because he had shot and killed someone in order to know what it felt like to kill someone.
After the police investigation led to Byford and Williams, Byford asked his girlfriend to provide an alibi for him by telling the police that on the night of the murder they had been on the phone all night.
Neither Byford nor Williams testified. However, Williams introduced, over Byford's objection, Byford's testimony from the first trial. The gist of that prior testimony was that Smith and Wilkins were boyfriend and girlfriend, that they argued that night, that Smith shot Wilkins, and that Byford and Williams only aided Smith in concealing the crime. The testimony also included Byford's admission that he had a prior felony conviction for attempted possession of a stolen vehicle. In closing argument, the prosecutor referred to Byford as a convicted felon.
The jury found Byford and Williams guilty of first-degree murder with the use of a deadly weapon.
At the penalty hearing, the State called Marian Wilkins, the mother of the victim, to testify on the impact of losing her daughter. A probation officer testified that Byford had violated his probation conditions in 1991 and been placed under house arrest. Byford violated house arrest in 1992 by removing his transmitter bracelet and absconding. The officer also described Byford's juvenile record, which included burglary in 1984 and carrying a concealed weapon in 1987. A detention officer testified that in 1994 Byford was disciplined for fighting with another inmate at the Clark County Detention Center; the officer considered Byford to be a behavioral problem for the Center.
Two of Byford's aunts testified to Byford's good character growing up, as did his sister. Byford's mother also testified on his behalf and described him as a good boy and a caring son. Byford and his father had often got in conflicts, and his father was "heavy-handed" in disciplining him. Byford was very close to his grandfather. When his grandfather died, he became angry and withdrawn and quit attending church. Byford's mother was raising Byford's son. Byford talked with his son on the phone and was a good influence on him.
Thomas Kinsora, a Ph.D. in clinical neuropsychology, testified for Byford. Byford was diagnosed with attention deficit disorder as a child. He had conflicts with and anger toward his father for the latter's abuse of alcohol and emotional distance. Byford lost interest in school and immersed himself in alcohol and marijuana after his grandfather's death. He later used methamphetamines heavily for a time. After testing Byford, Dr. Kinsora concluded that the results were largely unremarkable and that Byford was not psychopathic.
Byford spoke briefly in allocution and said that he was sorry for his part in Wilkins's death.
In Byford's case, jurors found one mitigating circumstance: possible substance abuse. The jury found two aggravating circumstances: *707 the murder was committed by a person under sentence of imprisonment and involved torture or mutilation of the victim. Byford received a sentence of death. In Williams's case, jurors found six mitigating circumstances. One aggravating circumstance was found: the murder involved torture or mutilation of the victim. Williams received a sentence of life imprisonment without possibility of parole.

DISCUSSION

I. Alleged errors related to the admission of appellant's prior testimony.

Neither Byford nor Williams testified during the guilt phase. However, Williams introduced, over Byford's objection, Byford's testimony from the first trial. As stated above, the gist of that prior testimony was that Smith and Wilkins were boyfriend and girlfriend, that they argued that night, that Smith shot Wilkins, and that Byford and to a lesser extent Williams only aided Smith in concealing the crime. The testimony also included Byford's admission that he had a prior felony conviction for attempted possession of a stolen vehicle, and in closing argument the prosecutor referred to Byford as a convicted felon.

A. Admission of the prior testimony and appellant's constitutional rights.

Byford asserts that admission of his prior testimony violated his constitutional rights. We conclude that this assertion lacks merit.[1]
First, Byford argues that his waiver of the right to remain silent at his first trial was invalid because he was not informed that his testimony could be used at a later proceeding. He offers no authority to support this argument. The New Mexico Court of Appeals rejected the same argument, holding that an explicit warning that testimony might be used in a future trial is not required. State v. DeSantos, 91 N.M. 428, 575 P.2d 612, 614 (Ct.App.1978). DeSantos does not provide much explanation for its holding, but we conclude that the holding is correct because Byford's argument is not persuasive when scrutinized. It rests on the unspoken premise that even though he considered it in his best interest to testify when faced with the certainty of his first trial, he would nevertheless have chosen not to testify to avoid the possibility, if he had been informed of it, that his testimony might be used at a retrial. This premise makes no sense, and the argument has no merit.
Second, Byford contends that he was compelled to testify at the first trial due to constitutional violations during that trial. If so, his prior testimony would not be admissible. See Harrison v. United States, 392 U.S. 219, 222, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968); U.S. v. Pelullo, 105 F.3d 117, 125 (3d Cir.1997). Byford's first conviction was reversed because of improper comments on his Fifth Amendment right to remain silent; however, he concedes that the comments occurred after he had testified, therefore, those comments could not have compelled him to testify. He asserts that other errors occurred earlier in the first trial which caused him to testify, but he fails to specify them. This claim therefore warrants no relief. See Maresca v. State, 103 Nev. 669, 673, 748 P.2d 3, 6 (1987) (this court need not address issues unsupported by cogent argument).
Third, Byford contends that the use of his prior testimony constituted an improper comment on his decision not to testify at the second trial. Byford does not cite authority or refer to any facts to support this contention. Generally, a defendant's testimony at a former trial is admissible against him in later proceedings. Harrison, 392 U.S. at 222, 88 S.Ct. 2008. "[I]f otherwise admissible, a defendant's prior testimony may be introduced at a second trial as part of the state's case-in-chief." Turner v. State, 98 Nev. 103, 106, 641 P.2d 1062, 1064 (1982). Moreover, in this case, the State did not introduce the prior testimony; Williams, Byford's codefendant, did. Our review of the record indicates that the State never referred to the prior testimony as a way of *708 commenting on Byford's silence at the second trial.

B. Admission of the prior testimony and the rules of evidence.

Byford maintains that admission of his prior testimony was improper under the rules of evidence. In response, the State primarily cites authority which would have allowed it to introduce the testimony against Byford, but this misses the point since Williams introduced the testimony. For example, NRS 51.035(3) allows a statement made by or attributable to a party to be offered against that party, but Williams did not offer Byford's prior testimony against Byford, but against the State.
Nevertheless, the prior testimony was admissible pursuant to NRS 51.325, which provides:
Testimony given as a witness at another hearing of the same or a different proceeding... is not inadmissible under the hearsay rule if:
1. The declarant is unavailable as a witness; and
2. If the proceeding was different, the party against whom the former testimony is offered was a party or is in privity with one of the former parties and the issues are substantially the same.
This statute applies here. First, Byford, the declarant, was unavailable due to invocation of his Fifth Amendment right not to testify. See Funches v. State, 113 Nev. 916, 923, 944 P.2d 775, 779 (1997). Second, the issues in both trials were the same. Third, the party against whom Williams offered the prior testimony was the State, a former party.

C. Admission of evidence of prior bad acts.

The reading of Byford's prior testimony revealed that he had a prior felony conviction for attempted possession of a stolen vehicle, and in closing argument the prosecutor referred to Byford as a convicted felon. Also, when Smith testified for the State, the prosecutor asked him how long he had known Byford before he met Williams. Smith said, "I'd saywell, I met him in the 120-day evaluation in." The prosecutor interrupted, "Whatno, I'm talking about Mr. Williams, not [Byford]." Byford moved unsuccessfully for a mistrial after the latter incident and declined a curative instruction. Later in Smith's testimony, the jury learned that before the murder in this case occurred, Smith had been convicted of a felony and served some time in prison.
Byford contends that these references to his prior conviction and 120-day evaluation were improper character evidence. The State asserts that the jury would not have taken the statement regarding "the 120-day evaluation" as a reference to a bad act.
Smith's reference to meeting Byford at "the 120-day evaluation" was improper because a reasonable juror could conclude from Smith's statement that Byford had engaged in prior criminal activity. See Rice v. State, 108 Nev. 43, 44, 824 P.2d 281, 281-82 (1992). However, we conclude that the error was harmless. The statement was unsolicited and inadvertent, the reference to criminal activity was brief and indirect, and Byford declined the district court's offer to give a curative instruction. See id.
The evidence of Byford's prior conviction was also improperly admitted. The State first argues that it was admissible under NRS 50.095(1), which provides that a witness's felony conviction is admissible for the purpose of attacking the credibility of the witness. However, Byford was not a witness at the second trial; on its face, therefore, NRS 50.095(1) does not apply. Cf. Commonwealth v. Boyle, 498 Pa. 486, 447 A.2d 250, 255 (1982) (nontestifying defendant's prior testimony was admissible as substantive evidence of guilt, but the defendant's "credibility as a witness was not in issue and therefore there was no basis for the allowance of evidence to demonstrate his unreliability as a witness").
The State also argues the evidence was admissible based on NRS 51.069(1), which provides: "When a hearsay statement has been admitted in evidence, the credibility of the declarant may be attacked or supported by any evidence which would be admissible for those purposes if the declarant *709 had testified as a witness." We reject this argument as well since it does not consider that the declarant in this case was a criminal defendant who invoked his Fifth Amendment right not to testify and enjoyed a due process right to a fair trial. In light of these rights, we conclude that the legislature did not intend NRS 51.069(1) as a basis for admitting evidence of a criminal defendant's prior convictions any time another party introduces a hearsay statement made by the defendant.
Byford likens the use of his prior testimony to the use of a confession. Prior bad act evidence disclosed in a defendant's confession is only admissible subject to NRS 48.045(2) after a hearing outside the presence of a jury. Walker v. State, 112 Nev. 819, 823-24, 921 P.2d 923, 926 (1996). We consider Byford's analogy between use of a defendant's prior testimony and use of a defendant's confession under Walker to be apt. Both implicate the same concern that prior bad acts not be allowed in simply as character evidence.
Here, the district court should simply have redacted the portion of the prior testimony relating to Byford's prior conviction. Byford asked the court to do so, but the court refused. Therefore, the evidence of Byford's prior conviction was improperly admitted, and the prosecutor improperly referred to Byford as a convicted felon. Nevertheless, reversal is not warranted if "the result would have been the same if the trial court had not admitted the evidence." Qualls v. State, 114 Nev. 900, 903-04, 961 P.2d 765, 767 (1998). Even without this evidence and Smith's reference to "the 120-day evaluation," we conclude that the jury would have convicted Byford of murder. The prior conviction was not heinousattempted possession of a stolen vehicleand the evidence against Byford in this case, particularly in light of his numerous admissions, was overwhelming.

D. Reference to the prior testimony during the prosecutor's closing argument.

In closing argument in the guilt phase, the prosecutor referred to Byford's prior testimony several times. Byford claims that this was improper.
At one point in his prior testimony, Byford admitted that he had intended to build an alibi for Smith, Williams, and himself by pretending that they had bowled the night of the murder; Byford said that he knew a person who worked at the bowling alley. The prosecutor referred to this evidence in closing argument and asked, "Where's that person?" Byford immediately objected, and the court ordered the question stricken.
The State contends that the prosecutor was simply saying that this evidence was uncorroborated. Alternatively, it argues that the error was harmless.
"It is generally improper for a prosecutor to comment on a defendant's failure to call a witness. Such comment can be viewed as impermissibly shifting the burden of proof to the defense." Rippo v. State, 113 Nev. 1239, 1253, 946 P.2d 1017, 1026 (1997) (citation omitted), cert. denied, 525 U.S. 841, 119 S.Ct. 104, 142 L.Ed.2d 83 (1998). The prosecutor's rhetorical question improperly implied that Byford carried a burden of proof on this issue; however, the issue was of little significance. It is not clear why the prosecutor even challenged Byford's claim regarding the aborted alibi attempt; Byford admitted in his prior testimony that it was a fabrication. Furthermore, the district court immediately sustained the objection and struck the question. Given the evidence against Byford, the error was clearly harmless. See id.
Byford challenges several other references to his prior testimony as improper comments on his decision not to testify. We conclude that the prosecutor's references were neither intended as, nor reasonably understood to be, comments on Byford's decision not to testify at the second trial. Byford complains that the prosecutor specifically referred to his "testimony" and even his "cross-examination." However, before Byford's statements were read, the jury was expressly told that they were his "prior sworn testimony." Byford did not object either to this or to any of the State's references which he now takes exception to. We discern no error in these statements by the prosecutor.

*710 E. Denial of appellant's motion to sever.

Before trial, Byford moved unsuccessfully to sever his trial from Williams's. Byford says that joinder was improper because it prejudiced him. His primary argument is that use of his prior testimony by Williams damaged his defense.[2]
Joinder of defendants is within the discretion of the district court, and its decision will not be reversed absent an abuse of discretion. Lisle v. State, 113 Nev. 679, 688, 941 P.2d 459, 466 (1997), cert. denied, 525 U.S. 830, 119 S.Ct. 81, 142 L.Ed.2d 63 (1998); see also NRS 174.165(1). A court must consider not only the possible prejudice to the defendant but also the possible prejudice to the state resulting from expensive, duplicitous trials. Lisle, 113 Nev. at 688-89, 941 P.2d at 466.
The State chose not to introduce either defendant's prior testimony, apparently because Byford and Williams did not testify at the second trial and the State feared that introducing the testimony of each would violate the other's Sixth Amendment right of confrontation under Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Bruton holds that a nontestifying defendant's admission which expressly incriminates another defendant cannot be used at a joint trial. See, e.g., Ducksworth v. State, 114 Nev. 951, 966 P.2d 165 (1998) (due to Bruton violation, it was reversible error not to grant severance of codefendants' trials).
However, if Byford's trial had been severed, then the State could have used Byford's prior testimony against him as an admission without violating Williams's Sixth Amendment right of confrontation. See NRS 51.035(3)(a). Therefore, severance would not have prevented the introduction of his prior testimony, and the joint trial did not unfairly prejudice Byford in this regard.

II. Appellant's right to a speedy trial.

Byford contends that his right to a speedy trial was violated as a result of the joinder of his trial with Williams's.
On January 3, 1997, this court reversed the original convictions and remanded. Murray, 113 Nev. at 11, 930 P.2d at 121. At a hearing on February 20, 1997, Byford invoked his right to a speedy trial, and trial was scheduled for April 28, 1997. Williams moved to continue the trial. At a hearing on April 1, 1997, trial was reset for August 18, 1997. Byford's counsel did not oppose the resetting, although Byford himself said that he was not waiving his speedy trial right. On July 30, 1997, the State moved to continue the trial due to the unavailability of two witnesses. Both Byford and Williams opposed the motion, but the district court granted it and reset the trial for October 13, 1997. On August 21, 1997, lead counsel for Williams was allowed to withdraw due to a conflict with Williams. Byford objected to any continuance. On September 8, 1997, Williams's new counsel requested a continuance. Although Byford and the State opposed continuance, the court reset the trial for February 23, 1998. The jury trial began on that date.
NRS 178.556(1) provides that if the defendant has not postponed the trial, the district court may dismiss a case not brought to trial within sixty days after arraignment. The State argues that this provision is not applicable here because no arraignment occurred after remand. Even if this argument is sound, Byford still had a constitutional right to a speedy trial. If the statute applies, its sixty-day time frame is mandatory only when there is no good cause for delay. Sessions v. State, 111 Nev. 328, 332 n. 4, 890 P.2d 792, 796 n. 4 (1995). As discussed below, we conclude that there was good cause.
To determine if a defendant's Sixth Amendment right to a speedy trial was violated, a court must conduct a balancing test. Barker v. Wingo, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The court should consider the length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. Id. *711 Unless the delay is long enough to be presumptively prejudicial, inquiry into the other factors is not necessary. Id.
First, the delay here totaled about one year. This is not extreme, but long enough to conceivably cause prejudice. Second, although Byford was not responsible for any delays, the delays all appear proper. The State was responsible for one continuance, but Byford does not dispute that the State had good reason for the delay. Williams was responsible for the other two continuances, and again Byford has not alleged that they were not legitimate. Third, Byford asserted his speedy trial right in a timely fashion. Finally and most importantly, Byford has not demonstrated that he was prejudiced by the delay. He complains that the delay allowed the State to reassemble its witnesses, but such "prejudice" is not unfair. He also notes that he was held without bail awaiting retrial, but he does not explain how this was improper or prejudicial in this case.
Byford suffered no prejudice; therefore, his right to a speedy trial was not violated, and the joint trial was not erroneous.

III. Admission of photographs of the victim and maggots collected from her body.

Byford contends that maggots found on Wilkins's body (and preserved in a jar of formaldehyde) and photographs of the body lacked probative value, were highly prejudicial, and were therefore erroneously admitted. The State responds that the photos were admitted to portray the crime scene, to aid a witness in describing the cause of death, to corroborate Smith's testimony as to how the murder occurred, and to show the extent of damage to the body and demonstrate why so few bullets were found in the body. The State asserts that it introduced the maggots to corroborate testimony that Byford had admitted to having seen maggots on the body.
The photographs in question numbered six. The district court considered them and Byford's objections and concluded that the photos were relevant to show the crime scene and the condition of the victim's body. The court admitted the maggots as corroborative of the testimony regarding Byford's admissions.
"Admission of evidence is within the trial court's sound discretion; this court will respect the trial court's determination as long as it is not manifestly wrong." Colon v. State, 113 Nev. 484, 491, 938 P.2d 714, 719 (1997). Gruesome photos are admissible if they aid in ascertaining the truth. Scott v. State, 92 Nev. 552, 556, 554 P.2d 735, 738 (1976). "Despite gruesomeness, photographic evidence has been held admissible when it accurately shows the scene of the crime or when utilized to show the cause of death and when it reflects the severity of wounds and the manner of their infliction." Theriault v. State, 92 Nev. 185, 193, 547 P.2d 668, 674 (1976) (citations omitted), overruled on other grounds by Alford v. State, 111 Nev. 1409, 1415 n. 4, 906 P.2d 714, 717 n. 4 (1995).
We conclude that the district court's decision to admit this evidence was not manifestly wrong.

IV. The district court's refusal to allow defense counsel to question a state's witness regarding her conversation with prosecutors.

At the first trial, the State called Jennifer Green as a witness. On cross-examination, she testified that she had spoken to prosecutors before the trial and they had told her that they did not believe Smith was as innocent as he was saying. The State objected to the statement as hearsay, and the district court overruled the objection. Green testified again at the second trial, but this time the district court sustained the State's objection when Williams's counsel asked her what prosecutors had said about Smith.
Byford contends that the district court erred in the second trial. He argues that the ruling in the first trial was the law of the case because the State did not appeal the ruling. He also argues that the evidence was not hearsay because it was offered not for its truth but to show the effect it had on the witness.
First, a trial court ruling does not constitute law of the case. "The law of a first appeal is the law of the case on all *712 subsequent appeals in which the facts are substantially the same." Walker v. State, 85 Nev. 337, 343, 455 P.2d 34, 38 (1969) (emphasis added), vacated in part on other grounds by 408 U.S. 935, 92 S.Ct. 2855, 33 L.Ed.2d 750 (1972). This court did not adjudicate this issue in the first appeal so no law of the case exists in regard to it.
Second, evidence that a "statement was made and the listener was affected by the statement" is not hearsay if not offered to show the truth of the statement. See Wallach v. State, 106 Nev. 470, 473, 796 P.2d 224, 227 (1990). However, Byford fails to show here how any effect on the witness was relevant. He does not claim that evidence of the prosecutor's statement was necessary to provide context for any action by the witness the usual basis for such evidence. See id. He argues that it was relevant to show a possible effect on the witness's testimony, but does not explain what that effect was or how it was relevant.
"The decision to admit or exclude evidence is within the sound discretion of the district court." Johnson v. State, 113 Nev. 772, 776, 942 P.2d 167, 170 (1997). We conclude that it was within the district court's sound discretion to exclude this evidence.

V. The instruction on implied malice and the "antisympathy" instruction.

Pursuant to NRS 200.020(2), the jury was instructed: "Malice shall be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart." (Emphasis added.) Byford contends that the emphasized language creates a mandatory presumption, which is unconstitutional. We have held that this instruction is proper if the jury is properly instructed on the presumption of innocence. See Doyle v. State, 112 Nev. 879, 900-02, 921 P.2d 901, 915-16 (1996). The jury received such instruction here.
The jury also received a so-called "antisympathy instruction," which Byford contends undermined his right to have the jury consider all mitigating evidence. This court has rejected this contention where the jury was also instructed to consider any mitigating factors. See Wesley v. State, 112 Nev. 503, 519, 916 P.2d 793, 803-04 (1996). The jury was so instructed here.
We conclude that these instructions were proper.

VI. The instructions defining the mens rea required for first-degree murder.

The jury in this case was instructed:
Premeditation is a design, a determination to kill, distinctly formed in the mind at any moment before or at the time of the killing.
Premeditation need not be for a day, an hour or even a minute. It may be as instantaneous as successive thoughts of the mind. For if the jury believes from the evidence that the act constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly the premeditation is followed by the act constituting the killing, it is willful, deliberate and premeditated murder.
We will refer to this as the Kazalyn instruction because it first appears in this court's case law in Kazalyn v. State, 108 Nev. 67, 75, 825 P.2d 578, 583 (1992).
Byford argues that this instruction is improper because it mandates a finding of willful, deliberate, and premeditated murder based only on the existence of premeditation. Although we reject this argument as a basis for any relief for Byford, we recognize that it raises a legitimate concern which this court should address.
We conclude that the evidence in this case is clearly sufficient to establish deliberation and premeditation on Byford's part. Byford and Williams had talked of "get[ting] rid" of the victim on prior occasions. On the night of the murder, Byford handed the gun to Williams, saying that he (Byford) "couldn't do it," and told Smith to "stay out of it." Thus, it is evident that Byford and Williams discussed shooting the victim before doing so. Williams and Byford then calmly and dispassionately shot the victim in the absence of any provocation, confrontation, or stressful circumstances of any kind. Williams first shot her several times and then, after a *713 passage of some time, shot her several more times. Byford watched this transpire, and when the victim was helpless on the ground, he took the gun from Williams, said that he would make sure she was dead, and shot her in the head twice. This evidence was sufficient for the jurors to reasonably find that before acting to kill the victim Byford weighed the reasons for and against his action, considered its consequences, distinctly formed a design to kill, and did not act simply from a rash, unconsidered impulse. See Briano v. State, 94 Nev. 422, 425, 581 P.2d 5, 7 (1978) (evidence of premeditation and deliberation is seldom direct, and circumstantial evidence may be taken into account to provide sufficient evidence).
The Kazalyn instruction, however, does raise a concern which we will now consider.
NRS 200.030(1)(a) provides in relevant part that murder perpetrated by "willful, deliberate and premeditated killing" is first-degree murder. In this regard, willful means intentional. See State v. Brown, 836 S.W.2d 530, 538 (Tenn.1992). Therefore, willful first-degree murder requires that the killer actually intend to kill. Cf. Wayne R. LaFave & Austin W. Scott, Jr., Criminal Law § 7.7, at 642 (2d ed.1986). Not every murder requires an intent to kill. For example, murder can also exist when a killer acts with a reckless disregard for human life amounting to "an abandoned and malignant heart." See NRS 200.020(2); cf. Model Penal Code and Commentaries § 210.2 cmt. 1 at 13-15 (Official Draft and Revised Comments 1980); LaFave & Scott, Criminal Law, § 7.1(a), at 605-07. However, such a murder would not constitute willful first-degree murder.
In addition to willfulness, the statutory provision in question requires deliberation and premeditation. These are the truly distinguishing elements of first-degree murder under this provision. Cf. Brown, 836 S.W.2d at 538. But the jurisprudence of Nevada, like that of other states, has shown a "trend toward a confusion of premeditation and deliberation." Id. at 540. We therefore take this opportunity to "adhere to long-established rules of law and ... abandon the modern tendency to muddle the line between first-and second-degree murder." Id. at 543.
The Kazalyn instruction and some of this court's prior opinions have underemphasized the element of deliberation. The neglect of "deliberate" as an independent element of the mens rea for first-degree murder seems to be a rather recent phenomenon. Before Kazalyn, it appears that "deliberate" and "premeditated" were both included in jury instructions without being individually defined but also without "deliberate" being reduced to a synonym of "premeditated." See, e.g., State of Nevada v. Harris, 12 Nev. 414, 416 (1877); Scott v. State, 92 Nev. 552, 554 n. 2, 554 P.2d 735, 737 n. 2 (1976). We did not address this issue in our Kazalyn decision, but later the same year, this court expressly approved the Kazalyn instruction, concluding that "deliberate" is simply redundant to "premeditated" and therefore requires no discrete definition. See Powell v. State, 108 Nev. 700, 708-10, 838 P.2d 921, 926-27 (1992), vacated on other grounds by 511 U.S. 79, 114 S.Ct. 1280, 128 L.Ed.2d 1 (1994). Citing Powell, this court went so far as to state that "the terms premeditated, deliberate and willful are a single phrase, meaning simply that the actor intended to commit the act and intended death as the result of the act." Greene v. State, 113 Nev. 157, 168, 931 P.2d 54, 61 (1997).
We conclude that this line of authority should be abandoned. By defining only premeditation and failing to provide deliberation with any independent definition, the Kazalyn instruction blurs the distinction between first- and second-degree murder. Greene's further reduction of premeditation and deliberation to simply "intent" unacceptably carries this blurring to a complete erasure.
We acknowledge that the jurisprudence of this court on this issue has not been consistent, but in Powell we overlooked earlier pronouncements of this court which recognized that "deliberate" and "premeditated" define distinct elements. In Hern v. State, 97 Nev. 529, 532, 635 P.2d 278, 280 (1981), this court stated: "It is clear from the statute that all three elements, willfulness, deliberation, and premeditation, must be proven *714 beyond a reasonable doubt before an accused can be convicted of first degree murder." (Emphasis added.) See also State v. Wong Fun, 22 Nev. 336, 341, 40 P. 95, 96 (1895). But see State of Nevada v. Lopez, 15 Nev. 407, 414 (1880).
In sum, the Kazalyn instruction and Powell and its progeny do not do full justice to the phrase "willful, deliberate, and premeditated." Deliberation remains a critical element of the mens rea necessary for first-degree murder, connoting a dispassionate weighing process and consideration of consequences before acting. "In order to establish first-degree murder, the premeditated killing must also have been done deliberately, that is, with coolness and reflection." Brown, 836 S.W.2d at 539; see also LaFave & Scott, Criminal Law § 7.7(a), at 643.
Because deliberation is a distinct element of mens rea for first-degree murder, we direct the district courts to cease instructing juries that a killing resulting from premeditation is "willful, deliberate, and premeditated murder." Further, if a jury is instructed separately on the meaning of premeditation, it should also be instructed on the meaning of deliberation.[3]
Accordingly, we set forth the following instructions for use by the district courts in cases where defendants are charged with first-degree murder based on willful, deliberate, and premeditated killing.
Murder of the first degree is murder which is perpetrated by means of any kind of willful, deliberate, and premeditated killing. All three elementswillfulness, deliberation, and premeditationmust be proven beyond a reasonable doubt before an accused can be convicted of first-degree murder.
Willfulness is the intent to kill. There need be no appreciable space of time between formation of the intent to kill and the act of killing.
Deliberation is the process of determining upon a course of action to kill as a result of thought, including weighing the reasons for and against the action and considering the consequences of the action.
A deliberate determination may be arrived at in a short period of time. But in all cases the determination must not be formed in passion, or if formed in passion, it must be carried out after there has been time for the passion to subside and deliberation to occur. A mere unconsidered and rash impulse is not deliberate, even though it includes the intent to kill.[4]
Premeditation is a design, a determination to kill, distinctly formed in the mind by the time of the killing.
Premeditation need not be for a day, an hour, or even a minute. It may be as instantaneous as successive thoughts of the mind. For if the jury believes from the evidence that the act constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly the act follows the premeditation, it is premeditated.
The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to *715 kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances.
The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not deliberation and premeditation as will fix an unlawful killing as murder of the first degree.

VII. The district court's refusal of a proposed instruction on mitigating circumstances.

During the settling of penalty phase jury instructions, Byford objected to the district court's instruction on mitigators and offered his own instruction setting forth the mitigating circumstances which he alleged existed in his case. The court rejected the proposed instruction. (The rejected instruction does not appear in the record.) The jury was simply instructed in regard to six of the seven mitigators enumerated in NRS 200.035, including the general one: "Any other mitigating circumstances."
Byford contends that the district court erred. He argues that a defendant has a right to instruct the jury on his defense theory as long as there is some evidence, no matter how weak or incredible, to support it.[5]See, e.g., Williams v. State, 99 Nev. 530, 665 P.2d 260 (1983).
It is possible that the district court erred in disallowing Byford's proposed instruction. NRS 175.554(1) provides that in a capital penalty hearing before a jury, the court shall instruct the jury on the relevant aggravating circumstances and "shall also instruct the jury as to the mitigating circumstances alleged by the defense upon which evidence has been presented during the trial or at the hearing." NRS 175.554(1) therefore requires instructions on alleged mitigators upon which evidence has been presented and does not restrict such instructions to the enumerated statutory mitigators. Therefore, Byford was entitled to appropriate jury instructions on unenumerated mitigating circumstances for which he had presented evidence.
However, Byford has not provided this court with the contents of his proposed instruction, so we cannot ascertain whether the specific instruction at issue was proper or not. "It is the appellant's responsibility to provide the materials necessary for this court's review." Jacobs v. State, 91 Nev. 155, 158, 532 P.2d 1034, 1036 (1975). Furthermore, Byford did not cite NRS 175.554(1) to the district court as grounds for his proposed instruction. Therefore, he did not properly preserve this issue for appeal. See Lizotte v. State, 102 Nev. 238, 239-40, 720 P.2d 1212, 1214 (1986) (appellate review requires that the district court be given a chance to rule on the legal and constitutional questions involved).
Even assuming that rejecting the proposed instruction was error, we do not deem it plain or constitutional error. The United States Supreme Court has held that the absence of instructions on particular mitigating factors does not violate the Eighth and Fourteenth Amendments. Buchanan v. Angelone, 522 U.S. 269, 275, 118 S.Ct. 757, 761, 139 L.Ed.2d 702 (1998). Byford was able to present his theories of mitigation to the jury in closing argument. Nothing precluded the jury from considering that argument and any evidence presented in mitigation. Thus, we are confident that no error requiring reversal occurred.

VIII. The penalty instructions regarding the use of character evidence.

During the penalty phase the State presented general character evidence against Byford in addition to evidence on the two alleged aggravating circumstances. Before the penalty hearing began, Williams and Byford unsuccessfully moved for a bifurcated *716 proceeding at which the character evidence would not be introduced unless and until the jury had found aggravating circumstances to exist. Byford claims that the jury was never instructed that the character evidence could not be used in "the weighing process to determine death eligibility." The record belies this claim.
The jury was instructed:
The jury may impose a sentence of death only if:
(1) The jurors find unanimously and beyond a reasonable doubt that at least one aggravating circumstance exists;
(2) Each and every juror determines that the mitigating circumstance or circumstances, if any, which he or she has found do not outweigh the aggravating circumstance or circumstances; and
(3) The jurors unanimously determine that in their discretion a sentence of death is appropriate.
This instruction is proper. See Geary v. State, 114 Nev. 100, 105, 952 P.2d 431, 433 (1998). The jury was further instructed that the State had alleged two aggravating circumstances against Byford and that
[o]ther arrests, conduct or bad acts, if any, committed by ... Byford are to be considered for character only and not as aggravating circumstances.
Evidence of any uncharged crimes, bad acts or character evidence cannot be used or considered in determining the existence of the alleged aggravating circumstance or circumstances.
These instructions properly inform jurors that in deciding whether to impose a death sentence, they may not consider general character evidence until they have determined that a defendant is eligible for the death penalty by finding: first, that at least one aggravator exists; and second, that any aggravators are not outweighed by any mitigators. See Middleton v. State, 114 Nev. 1089, 1117, 968 P.2d 296, 315 (1998), cert. denied, ___ U.S. ___, 120 S.Ct. 322, 145 L.Ed.2d 251 (1999).
Byford criticizes Lisle, 113 Nev. at 704, 941 P.2d at 475-76, but does not show how the criticism applies to this case. This court has stated: "To the extent that any language in Lisle suggests that [character evidence admitted pursuant to NRS 175.552(3)] can be used to determine death eligibility itself, we hereby reject that suggestion." Middleton, 114 Nev. at 1117 n. 9, 968 P.2d at 315 n. 9. The instructions here made no such suggestion.

IX. The aggravating circumstance of torture or mutilation.

Byford asserts that the decisions in which this court has considered the aggravating circumstance of torture or mutilation are inconsistent and irreconcilable, rendering this aggravator unconstitutionally vague. He also maintains that the victim was simply killed by multiple gunshots and that there was no evidence of torture or mutilation. We disagree. Regardless of whether there is any inconsistency in this court's decisions regarding this aggravating circumstance, we conclude that Byford has failed to show that the aggravator was found unconstitutionally in this case. The jury instructions defining torture and mutilation in this case were ones which we have determined are not unconstitutionally vague. See Browne v. State, 113 Nev. 305, 315-16, 933 P.2d 187, 193 (1997); Robins v. State, 106 Nev. 611, 627-30, 798 P.2d 558, 568-70 (1990). And the evidence was sufficient to establish that this murder involved torture and mutilation.
NRS 200.033(8) provides as an aggravating circumstance that "[t]he murder involved torture or the mutilation of the victim." Establishing either torture or mutilation is sufficient to support the jury's finding of this aggravating circumstance. See Parker v. State, 109 Nev. 383, 395, 849 P.2d 1062, 1070 (1993).
In discussing torture, we have held that "NRS 200.033(8) requires that the murderer must have intended to inflict pain beyond the killing itself." Domingues v. State, 112 Nev. 683, 702, 917 P.2d 1364, 1377 (1996). In Domingues, the evidence did not indicate that the appellant's "intent was anything other than to kill" the victim; there was no evidence that "the specific intent behind the attempted electrocution or the stabbing was *717 to inflict pain for pain's sake or for punishment or sadistic pleasure." Id. "Torture involves a calculated intent to inflict pain for revenge, extortion, persuasion or for any sadistic purpose." Id. at 702 n. 6, 917 P.2d at 1377 n. 6.
In maintaining that no evidence of torture exists here, Byford ignores the circumstances of the killing. Evidence indicated that Byford and Williams resented Wilkins because of perceived slights they had received from her. Thus revenge of a sort appears to have been their primary reason for shooting her. After shooting her in the back, Williams lied to Wilkinswho was under the influence of LSDdenying that he had shot her and telling her that he had only shot around her. When she realized she had been shot and asked why, he said because she was "a bitch" and then walked behind her and shot her again repeatedly. We conclude that the jury could have reasonably found that this behavior had a vengeful, sadistic purpose and was intended to inflict pain beyond the killing itself and therefore constituted torture. Byford, of course, was equally culpable of this torture: a person who aids and abets an act constituting an offense is a principal and subject to the same punishment as one who directly commits the act. See NRS 195.020.
This court has never expressly decided whether postmortem mutilation falls within the purview of NRS 200.033(8). Basing aggravating circumstances on the actions of the murderer following the victim's death is proper. See Lewis v. Jeffers, 497 U.S. 764, 783-84, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990) (concluding that the state court's finding of the aggravating circumstance of gratuitous violence was rationally supported by evidence that the defendant inflicted additional wounds on the dead victim); Conklin v. State, 254 Ga. 558, 331 S.E.2d 532, 539 (1985) (rejecting the argument that murder "terminates at the instant of death, so that nothing that happens afterward can be considered" in determining whether an aggravator exists).
In Flanagan v. State, 105 Nev. 135, 141, 771 P.2d 588, 592 (1989), this court declined to decide if dismemberment of a corpse is mutilation within the meaning of the statute. In another case, we also did not reach the issue, but stated that postmortem amputations of the victim's body showed depravity of mind (a former aggravator). See Cavanaugh v. State, 102 Nev. 478, 487, 729 P.2d 481, 486 (1986). In at least two other cases, without discussing this issue, we noted attacks inflicted on victims after their death as additional evidence of mutilation. Calambro v. State, 114 Nev. 106, 111, 952 P.2d 946, 949 (1998) ("After driving the bar through the skull, appellant attempted to separate the victim's skull in half."); Parker, 109 Nev. at 395, 849 P.2d at 1070 (the murderer plunged a knife into the dead victim's chest).
Our case law thus tends to support the conclusion that the aggravating circumstance set forth in NRS 200.033(8) includes postmortem mutilation. More important, this conclusion is consistent with the statutory language. Although a victim who has died cannot be tortured, mutilation can occur after death. By including both terms as a basis for the aggravator, the statute penalizes egregious behavior whether it occurs before or after a victim's death. We agree with the State's assertion that the legislative intent in making mutilation an aggravating circumstance "was to discourage the desecration of a fellow human being's body." We therefore take this opportunity to expressly hold that mutilation, whether it occurs before or after a victim's death, is an aggravating circumstance under NRS 200.033(8).
Postmortem mutilation occurred here when Byford set the body on fire. See Ortiz v. Stewart, 149 F.3d 923, 942 (9th Cir.1998), cert. denied, ___ U.S. ___, 119 S.Ct. 1777, 143 L.Ed.2d 806 (1999). Therefore, the evidence in this case supports a finding of both torture and mutilation.

X. Cumulative error.

Although individual errors may be harmless, the cumulative effect of multiple errors may violate a defendant's constitutional right to a fair trial. Pertgen v. State, 110 Nev. 554, 566, 875 P.2d 361, 368 (1994). Byford argues that such a cumulative effect exists here.
*718 We have concluded that two errors occurred: improper references were made to Byford's prior criminal activity, and the prosecutor improperly implied that Byford had the burden of calling a witness. Also, the district court possibly erred in disallowing Byford's proposed instruction on mitigating circumstances. Even considered cumulatively, these errors were harmless.

XI. Review of the death sentence under NRS 177.055.

NRS 177.055(2), in part, requires this court to review:
(c) Whether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor; and
(d) Whether the sentence of death is excessive, considering both the crime and the defendant.
Byford contends that his death sentence is excessive, arguing as follows. Smith's testimony was the State's primary evidence of the murder, and that testimony showed that Williams was more culpable in murdering Wilkins. The penalty hearing evidence also showed that Williams had caused a great deal of trouble while in prison between the first and second trials. Byford asserts that he has been "an exemplary prisoner" during his years of imprisonment and was only twenty at the time of the murder. Yet he was sentenced to death while Williams received a sentence less than death.
The record indeed shows that Williams took the initiative in murdering Wilkins and has caused worse disciplinary problems as an inmate. But Byford overlooks the fact that his criminal record prior to the murder was worse than Williams's. Because Byford was on probation at the time of the murder, the jury found an additional aggravating circumstance in his case, for a total of two, versus one for Williams. And the jury found only one mitigating circumstance in Byford's case, versus six for Williams. One was Williams's youth: he was younger than Byford, only seventeen, at the time of the murder. Finally, the evidence showed that Byford fired two fatal shots into the victim's head when she was completely helpless, threatened to kill Smith if he told, and took the initiative in concealing the crime. Thus, Byford's culpability in the murder was comparable to Williams's.
We conclude that Byford's death sentence is not excessive and that there is no evidence it was imposed under the influence of passion, prejudice, or any arbitrary factor.

CONCLUSION
We affirm Byford's conviction and sentence of death.
ROSE, C.J., YOUNG, AGOSTI, LEAVITT, and BECKER, JJ., concur.
MAUPIN, J., concurring.
The jury in this case was instructed in the following manner:
Premeditation is a design, a determination to kill, distinctly formed in the mind at any moment before or at the time of the killing.
Premeditation need not be for a day, an hour or even a minute. It may be as instantaneous as successive thoughts of the mind. For if the jury believes from the evidence that the act constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly the premeditation is followed by the act constituting the killing, it is willful, deliberate and premeditated murder.
As noted by the majority, this instruction mirrors our observations in Kazalyn v. State, 108 Nev. 67, 75, 825 P.2d 578, 583 (1992). I write separately to offer an alternative approach to the concern that the line between first- and second-degree murder has arguably been blurred by Kazalyn and other opinions of this court discussing premeditation as a separate element of first-degree murder.

DISCUSSION
NRS 200.010 defines murder in relevant part as the "unlawful killing of a human being, with malice aforethought, either express or implied ...." Once it has been established that a murder has been committed, that is an unlawful killing with malice *719 aforethought, the offense must then be classified by degree. See Graham v. State, 116 Nev. ___, 992 P.2d 255 (2000).
Under NRS 200.030(1)(a), (b) and (c), the specifically enumerated homicides definitionally constitute murder in the first degree.[1]Id. The only subcategory of first-degree murder where first-degree murder is not self-defined is the broad general category of murders not specifically enumerated, i.e., the "other kind[s] of willful, deliberate and premeditated killing," referred to in the second phrase of NRS 200.030(1)(a). It is therefore the second phrase of NRS 200.030(1)(a) that provides the first line of departure in the analysis of whether a particular fact pattern falls within the first-degree murder construct or within the second-degree murder construct. See State v. Randolph, 49 Nev. 241, 246-47, 242 P. 697, 698 (1926); Graham, 116 Nev. at ___, 992 P.2d at 258 (2000).
The Kazalyn instruction invites concern when it defines premeditation as a "determination to kill"[2] because express malice means a deliberate intention to kill (see NRS 200.020(1); Keys v. State, 104 Nev. 736, 740, 766 P.2d 270, 272 (1988)), and, by definition, an "intention" is "a determination to act in a certain way." See Webster's Ninth New Collegiate Dictionary 629 (1985). Indeed, there is very little distinction between premeditation and malice aforethought, and therefore first- and second-degree murder, when we define premeditation in terms of a "determination to kill" and malice aforethought as an "intention to kill."[3]
My second concern arises from our decisional law discussing the three elements set forth in the second phrase of NRS 200.030(1)(a). In Hern v. State, 97 Nev. 529, 635 P.2d 278 (1981), we concluded that "all three elements, willfulness, deliberation, and premeditation, must be proven beyond a reasonable doubt before an accused can be convicted of first degree murder." Id. at 532, 635 P.2d at 280 (emphasis added). One could fairly deduce from this declaration that deliberation and premeditation are not synonymous and each must be proven separately.[4] In Powell v. State, 108 Nev. 700, 838 P.2d 921 (1992), however, we noted:
In [DePasquale v. State, 106 Nev. 843, 803 P.2d 218 (1990), cert. denied, 502 U.S. 829, 112 S.Ct. 99, 116 L.Ed.2d 70 (1991) ], as in [Briano v. State, 94 Nev. 422, 581 P.2d 5 (1978) ], we used the terms premeditated and deliberate as a single term.
Other jurisdictions have held that the terms deliberate, premeditate and willful *720 are a single phrase, meaning simply that the actor intended to commit the act and intended death to result....
....
We have set forth the requirement for premeditation in [Briano], where we stated "[T]he state must prove that a design to kill was distinctly and rationally formed in the mind of the perpetrator, at or before the time the fatal blows were struck.... [I]t [does not] matter how short a time existed between the formation of the design to kill and the killing itself." As long as the instruction on premeditation which is given to the jury comports with Briano, it is not necessary to separately define deliberateness or willfulness.
Id. at 709-10, 838 P.2d at 927 (quoting Briano, 94 Nev. at 425, 581 P.2d at 7) (citations omitted); see also Williams v. State, 113 Nev. 1008, 1017, 945 P.2d 438, 443 (1997) (affirming Powell); Doyle v. State, 112 Nev. 879, 900, 921 P.2d 901, 915 (1996) (affirming Powell); Witter v. State, 112 Nev. 908, 918, 921 P.2d 886, 893 (1996) (in affirming Powell, expressly concluding that a jury instruction identical to the one given in Byford's case gave the jury an accurate definition of premeditation and deliberation, and, therefore, that it was unnecessary to provide an additional instruction defining "deliberation"). Thus, whether deliberation and premeditation must be proven separately, or whether they refer to the same reflective process whereby proof of one necessarily proves the presence of the other, has become uncertain.
Accordingly, a majority of this court has concluded that some clarification of our murder jurisprudence is needed. First, because express malice means a deliberate intention to kill (see 200.020(1); Keys, 104 Nev. at 740, 766 P.2d at 272), and because a willful killing means one that is intentional (see Webster's Ninth New Collegiate Dictionary 1350 (1985) (defining "willful" as "done deliberately: Intentional")), the statutory requirement of NRS 200.030(1)(a) that "other" first-degree murders must be perpetrated willfully is merely a reiteration of the fact that express malice is always an element of this subcategory of first-degree murder. Thus, if the State can only prove that the killing was done willfully and unlawfully, but cannot separately prove premeditation, the defendant is guilty of second-degree murder.
Secondly, given the synonymous nature of express malice and "willfulness" as used in our murder jurisprudence, it is the presence of premeditation and deliberation that distinguishes first-degree murder from second-degree murder. We have previously concluded that "[t]here is nothing to indicate that ["premeditated" and "deliberate"] are used in law other than in their ordinary sense." Ogden v. State, 96 Nev. 258, 263, 607 P.2d 576, 579 (1980) (citing People v. Anderson, 73 Cal. Rptr. 550, 70 Cal.2d 15, 447 P.2d 942, 948 (1968) (recognizing that the California Legislature did not intend to give "deliberate" and "premeditated" meaning other than their ordinary dictionary meanings)). Therefore, because the word "premeditate" is defined as "to think, consider, or deliberate beforehand" (see Webster's Ninth New Collegiate Dictionary 928 (1985) (emphasis added)), I have concluded that there is no meaningful or appreciable difference between "premeditation" and "deliberation." In doing so, I would not completely disavow this court's previous conclusion in Hern that all three elementswillfulness, deliberation, and premeditation must be present in order to prove first-degree murder. Rather, I would simply reject any implication that premeditation and deliberation must be proven as separate and distinct concepts, and conclude that proof of premeditation will also suffice as proof of deliberation,[5] and vice versa.
Thirdly, premeditation is not merely an intention or "determination" to kill. The terms "willful, deliberate, and premeditated" do not connote the same general idea of an *721 intention to kill.[6] Our acceptance of as much obscures the distinction between murders of the first and second degree because it renders premeditation synonymous with one form of malice aforethought. All three terms (willfulness, deliberation and premeditation) involve intention but, as noted above, only "willfulness" exclusively connotes an intention to kill. As terms of art, separate and apart from willfulness, "premeditation" and "deliberation" additionally refer to actual reflection that occurs for any length of time prior to that instant when an individual is in possession of a determination or intention to kill.[7] That this period of reflection may be "as instantaneous as successive thoughts of the mind" is of no consequence, as such language merely instructs that the amount of time one spends premeditating and deliberating is irrelevant. Indeed, the true test is not the duration of time as much as it is the extent and quality of the reflection.[8]
Thus, what matters is that there is a period of time during which the mind actually thinks upon or considers the act (i.e., premeditates and deliberates). The end result is the formation of an intention or determination to kill and an act resulting in the death of another. If this sequence occurs, the crime is first-degree murder.[9] If the defendant has not had time to think upon or consider the act (i.e., has not premeditated and deliberated), but has intentionally killed another as the "instant effect of impulse," the crime is arguably second-degree murder.[10]
To effectuate these points of clarification, I would depart from the majority and suggest the following jury instructions for use by the district courts in cases where defendants are charged with first-degree murder pursuant to the second phrase of NRS 200.030(1)(a):
Murder is the unlawful killing of another with either express or implied malice aforethought.
Malice aforethought for these purposes is the intent to kill. An individual acts with express malice when he or she unlawfully *722 intends to kill another. Malice may be[11] implied to that individual when he or she unlawfully kills without considerable provocation or when the circumstances of the killing show an abandoned and malignant heart.
Murder of the first degree is the willful, deliberate, and premeditated killing of another in an unlawful manner. All three elementswillfulness, deliberation, and premeditationmust be proven beyond a reasonable doubt before an accused can be convicted of first-degree murder. In this context, the term "willful" has the same meaning as express malice. Therefore, proof that the killing was done with malice aforethought is also proof that the killing was done willfully.
In determining whether the elements of willfulness, deliberation and premeditation have been satisfied beyond a reasonable doubt, you must apply the ordinary meaning a reasonable person would apply to these terms.
Premeditation and deliberation refer to the same thought process. They each refer to a period of actual reflection that occurs prior to the formation of an intention to kill. Proof of premeditation is also proof of deliberation, and vice versa.
Premeditation is therefore a design, a determination to kill, distinctly formed in the mind at any moment before or at the time of the killing. Premeditation and deliberation need not be for a day, an hour or even a minute. They may be a period of time that is as instantaneous as successive thoughts of the mind. For, if the jury believes from the evidence that the act constituting the killing has been preceded by a period of premeditation and deliberation that results in the formation of an intention to kill, no matter how rapidly this period and formation of an intention to kill is followed by the act constituting the killing, it is willful, deliberate and premeditated murder.
The majority notes that "[d]eliberation remains a critical element of the mens rea necessary for first-degree murder, connoting a dispassionate weighing process and consideration of consequences before acting," and that "[i]n order to establish first-degree murder, the premeditated killing must also have been done deliberately, that is, with coolness and reflection." The majority relies on State v. Brown, 836 S.W.2d 530, 539 (Tenn.1992) with approval in support of this proposition. In my view, defining deliberation and premeditation in terms of an elaborate weighing process or "cold calculation" may very well define many types of premeditated murder out of existence and tacitly overrule our prior rulings on this issue in Williams and Witter. Further, although the instruction proposed by the majority does not actually require "coolness" or "cold calculation" as a condition of proof of deliberation or premeditation, the majority's language quoted above supported by the Tennessee decision in Brown will arguably require that district courts, upon request, give special jury instructions defining this category of first-degree murder in these terms.
*723 As noted by the majority, the evidence in this case is clearly sufficient to establish willfulness, deliberation, and premeditation on Byford's part. Thus, Byford's conviction should be sustained under the majority analysis and the analysis in this separate concurrence.
As noted above,[12] the use of the Kazalyn instruction does not mandate reversal.
NOTES
[1] The fact that this prior testimony included evidence of Byford's prior felony conviction is a separate issue which we address below.
[2] Byford also complains that several continuances by Williams violated his right to a speedy trial. We address this issue in the next section.
[3] Instructions defining deliberation and premeditation are not even required. See Ogden v. State, 96 Nev. 258, 263, 607 P.2d 576, 579 (1980); cf. Dawes v. State, 110 Nev. 1141, 1145-46, 881 P.2d 670, 673 (1994). "There is nothing to indicate that such words are used in law other than in their ordinary sense." Ogden, 96 Nev. at 263, 607 P.2d at 579.
[4] A homicide arising from an impulse of passion can be either second-degree murder or voluntary manslaughter depending on the circumstances. Voluntary manslaughter requires "a serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury on the person killing." NRS 200.050; see also NRS 200.040 and 200.060. If jurors find that a defendant "killed the deceased under the influence of uncontrollable passion, and without any mixture of deliberation, and if at the same time they [think] that the circumstances were not such as to justify the existence or persistence of irresistible passion in a reasonable man," then a verdict of second-degree murder is warranted. State of Nevada v. Ah Moot, 12 Nev. 369, 386-87 (1877). "Neither slight provocation nor an assault of a trivial nature will reduce a homicide from murder to manslaughter." State v. Fisko, 58 Nev. 65, 75, 70 P.2d 1113, 1116 (1937), overruled in part on other grounds by Fox v. State, 73 Nev. 241, 247, 316 P.2d 924, 927 (1957).
[5] Byford also asserts that it is unconstitutional to prevent a sentencing jury from considering any mitigating evidence proffered by the defendant. See, e.g., Lockett v. Ohio, 438 U.S. 586, 602-08, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). This is a correct statement of the law, but Byford has not shown that the jury was precluded from considering any evidence offered in mitigation.
[1] Murders committed by means of poison, lying in wait, torture or child abuse; murders committed in the commission of certain enumerated life-endangering felonies (the felony-murder rule); and murders committed to avoid lawful arrest or to escape from legal custody. NRS 200.030(1)(a), (b) and (c). (The 1999 legislature amended NRS 200.030, transferring murders perpetrated by child abuse into the felony-murder subcategory of first-degree murder. 1999 Nev.Stat., ch. 319, § 3, at 1335.) Felony-murder is the only category of murder where malice is statutorily presumed.
[2] The specific language of the Kazalyn instruction is that premeditation is "a design, a determination to kill." Kazalyn, 108 Nev. at 75, 825 P.2d at 583. The language arguably implies that a design and a determination are one and the same. Thus, the discourse in which we are engaged has become necessary. This having been said, use of the Kazalyn instruction does not warrant reversal of any prior convictions rendered in this State. This is because the use of the term "design," regardless of the potential ambiguity, is sufficient to convey a distinction between malice and either deliberation or premeditation, especially where, as here, there is substantial evidence to support findings of deliberation and premeditation as either the majority or this concurrence have defined these terms.
[3] This court has previously concluded that the terms "deliberate, premeditated, and willful," as used in defining first-degree murder, connote the same general idea"the intention to kill" (see Powell v. State, 108 Nev. 700, 709, 838 P.2d 921, 922 (1992), vacated on other grounds, 511 U.S. 79, 114 S.Ct. 1280, 128 L.Ed.2d 1 (1994)), notwithstanding the fact that we have previously declared that "[m]alice is not synonymous with either deliberation or premeditation." Hern v. State, 97 Nev. 529, 532, 635 P.2d 278, 280 (1981); see also Greene v. State, 113 Nev. 157, 168, 931 P.2d 54, 61 (1997) ("[T]he terms premeditated, deliberate and willful are a single phrase, meaning simply that the actor intended to commit the act and intended death as the result of the act.").
[4] Compare State v. Brown, 836 S.W.2d 530, 539 (Tenn.1992) ("In order to establish first-degree murder, the premeditated killing must also have been done deliberately, that is, with coolness and reflection.").
[5] The second phrase of NRS 200.030(1)(a) uses the words "willful, deliberate and premeditated." Our cases have treated the word "deliberate" as meaning "deliberation." As noted, I believe that deliberation as an element is subsumed within the process of premeditation. However, if the word deliberate does not mean "deliberated" or "deliberation," but means "to do on purpose," the term is simply a synonym for willfulness. Thus, the term "deliberate" does not as a practical matter affect the distinction between murders of the first and second degree.
[6] I would clarify Powell and its progeny to the extent that they conclude the contrary.
[7] As we stated in Payne v. State, 81 Nev. 503, 508-09, 406 P.2d 922, 925-26 (1965):

To make a killing deliberate[d] as well as premeditated, it is unnecessary that the intention to kill shall have been entertained for any considerable length of time. It is enough if there is time for the mind to think upon or consider the act, and then determine to do it. If, therefore, the killing is not the instant effect of impulseif there is hesitation or doubt to be overcome, a choice made as the result of thought, however short the struggle between the intention and the actit is sufficient to characterize the crime as deliberate and premeditated murder.
(Citation omitted.)
[8] The court in State v. Ramirez, 190 Ariz. 65, 945 P.2d 376, 380 (App.1997) stated:

We conclude that the first degree murder statute has never been aimed at those who had time to reflect but did not; it has always been aimed at those who actually reflectedand then murdered.
If the difference between first and second degree murder is to be maintained, premeditation has to be understood as reflection. It is fair to talk of the period of time in which reflection might occur; but it is not fair to define reflection as the period of time in which it might occur. To have meaning, the element of premeditation must describe something that defendant actually does. Just as murder requires actual killing, premeditation requires actual reflection.
[9] See Briano v. State, 94 Nev. 422, 425, 581 P.2d 5, 7 (1978) (evidence of premeditation and deliberation is seldom direct, and circumstantial evidence may be taken into account to provide sufficient evidence).
[10] This does not override the fact that our statutes define voluntary manslaughter as an unlawful killing that occurs "upon a sudden heat of passion, caused by a provocation apparently sufficient to make the passion irresistible" (i.e., "a serious and highly provoking injury"). NRS 200.040(2); NRS 200.050. Indeed, as we noted in State v. Salgado, 38 Nev. 413, 416-17, 150 P. 764, 765 (1915) (quoting Francis Wharton, Law of Homicide § 163 (3d Ed.1907)):

[a]uthority exists in support of the proposition that implied malice and sudden passion may coexist, in which case the offense is not reduced to the grade of manslaughter....
"If malice existed, the crime is murder, and not manslaughter, though sudden passion coexisted and the homicide was the product of both.... If the provocation is inconsiderable, the law implies malice, and the homicide is murder; if it is great, malice will not be inferred, and it will be deemed to be manslaughter."
See also State v. Fisko, 58 Nev. 65, 75, 70 P.2d 1113, 1116 (1937) ("Neither slight provocation nor an assault of a trivial nature will reduce a homicide from murder to manslaughter.").
[11] NRS 200.020(2) provides that "[m]alice shall be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart." (Emphasis added.) In Witter v. State, 112 Nev. 908, 917, 921 P.2d 886, 895 (1996), cert. denied, 520 U.S. 1217, 117 S.Ct. 1708, 137 L.Ed.2d 832 (1997), this court approved an instruction stating that malice "may" be implied "when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart." Unfortunately, the court wrongly stated that the exact language of the instruction used at trial in Witter had been approved in Guy v. State, 108 Nev. 770, 839 P.2d 578 (1992). This court also wrongly cited NRS 200.020(2) in support of its conclusion in this regard. In point of fact, the implied malice instruction in Guy followed NRS 200.020(2), utilizing the statutory term "shall" instead of "may." Technically, a defendant in a murder prosecution is not entitled to the instruction approved in Witter. Thus, to the extent Witter implies that "may" must be substituted for the statutory term "shall," it was decided in error. However, I would argue that it is not error to give the instruction approved in Witter because the use of "may" instead of "shall" does not affect any due process rights. Further, the instruction approved in Witter is preferable to the statutory instruction because it clearly eliminates the need to look to other instructions to determine if the State's burden of proof has been properly articulated. See Doyle v. State, 112 Nev. 879, 900-02, 921 P.2d 901, 915 (1996).
[12] See note 2.