# THE STATE OF NEVADA, Respondent, *v.* IVER FISKO, Appellant

### No. 3179

July 30, 1937.                                    70 P. (2d) 1113.

*Gordon W. Rice, John Alfred Beyer* and *Harlan L. Heward,* for Appellant:

68

*Gray Mashburn,* Attorney-General; *W. T. Mathews* and *W. Howard Gray,* Deputy Attorneys-General; *Ernest S. Brown,* District Attorney; and *Nash P. Morgan,* Deputy District Attorney, for the State:

## OPINION

By the Court, DUCKER, J.:

Appellant was convicted of the crime of murder of the first degree for killing his wife. The jury fixed his punishment at death and he was sentenced accordingly. He assigns as error the refusal of the court to give an instruction on manslaughter and form of verdict for such offense.

■ The first contention under this assignment is that it is the duty of the court in every case of murder to submit to the jury, under proper instructions, the issue of manslaughter, even though there is no evidence to prove the latter offense. It is argued that the intention of the legislature as to that duty is made manifest by sections 11017 N. C. L., 11001 N. C. L., and 9974 N. C. L. This court has repeatedly decided to the contrary. State

v. Millain, 3 Nev. 409; State v. Donovan, 10 Nev. 36, and State v. Johnny, 29 Nev. 203, 87 P. 3, 9. In each of these cases the accused was convicted of murder of the first degree and it was held that there was no error in refusing to instruct on manslaughter. When these cases were decided, the sections referred to were in force. It would seem, therefore, that the question is settled. But the cases of State v. Lindsey, 19 Nev. 47, 5 P. 822, 3 Am. St. Rep. 776, and State v. Oschoa, 49 Nev. 194, 242 P. 582, are adverted to, and it is claimed that they declare a rule in flat conflict with that laid down in the former cases. We perceive no conflict. In State v. Lindsey, supra, the accused was charged with murder by the administering of poison, and the jury found her guilty of murder in the second degree. It was held that they were empowered to do this for the reason that the statute leaves the question of degree to be settled by the jury. The court said, if the jury fix the crime at murder in the second degree, in a case where the law and facts make it murder in the first degree, it is error in favor of the prisoner, of which the law will not take cognizance, and of which the prisoner ought not to complain.

In State v. Oschoa, supra, in which the accused was charged with murder, he was convicted of involuntary manslaughter. It is contended that there was no evidence of any crime except murder. The court held that if this were the fact, the accused could not complain, for the reason that the statute leaves it to the jury to find any grade of homicide within the crime charged. It was pointed out, however, that the circumstances did not exclude manslaughter.

Such is the difference between these classes of cases. Where is the conflict between a rule that, in a case of homicide when the evidence tends only to prove a higher degree of crime, the court may properly refuse all instructions as to manslaughter, and one that in such a case the accused may not complain of a verdict of manslaughter? There is none.

The rule announced in State v. Millain, supra, and adhered to in State v. Donovan and State v. Johnny, is in accord with the great weight of authority. See 21 A. L. R. 607 et seq.; 27 A. L. R. p. 1098 et seq., and 102 A. L. R. p. 1021 et seq. There is nothing in the reasoning of appellant's counsel to persuade a departure from that rule.

The next contention under the assignment is that the record discloses evidence tending to prove manslaughter and which made it imperative for the court to instruct as to that offense. A summary of the evidence affording an intelligent view of the transaction is necessary.

Appellant killed his wife, Marie Fisko, by shooting her with a rifle on February 20, 1936, at about 5 p. m., at their home in Reno. He shot her twice, once in the head and once in the back, and then shot himself with the same weapon, inflicting a wound in the head which did not prove fatal. They were married in July 1932, and had one child, a daughter, three years of age. Deceased had two children by a former marriage, Mrs. Lois Rice, and a younger daughter fourteen years of age named Marie Swanson. Appellant and his wife lived for most of their married life at the Gallery Hotel in Reno. They moved from there to a house on Bell street in January 1936. They had separated about two weeks before the homicide occurred and a divorce was contemplated. During this time appellant, except on the night of the 17th of February, did not sleep at the house, but usually came in for dinner. On the 20th of February Mrs. Fisko was preparing to move to the Humboldt Apartments in Reno, and her daughter Lois, and the latter's mother-in-law, Mrs. Emma Rice, were engaged in cleaning the house preparatory to the change of abode. While they were so engaged, it was discovered that appellant was upstairs in bed. When Mrs. Fisko came home a short time afterwards, she was informed of appellant's presence. Emma Rice testified that Mrs. Fisko then went upstairs and soon they came down into the living room, appellant preceding her. He

was swearing a little. Mrs. Fisko spoke about the garbage on the back porch and told him to get his clothes out as she wanted to turn the key in. Appellant said all he had ever done for her was to pack rubbish and garbage, and went out. In about fifteen or twenty minutes he returned. He came to the front door, which was locked to keep the baby in. The witness opened the door and let him in. He locked the door. His wife was on the back porch, close to the back door of the porch, and he asked her just how far she expected him to get on $10. She replied: "Calm yourself, Fisko, and we will talk this matter over later." She then passed through between him and the witness and went into the living room. "He reached for the gun, you see, into the cellar way there. * * * I didn't see him get the gun, but I saw him have the gun." He followed her into the living room holding the gun in both hands. She grabbed him from the back around the neck—around his throat, and held him for a few seconds, crying to the witness to take the baby and call the police. She broke her hold, rushing back, calling again to the witness to take the baby and summon the police. When she was almost to the back door, appellant was behind her. The witness heard him say that "she was no good and didn't amount to anything, and he said he guessed she wanted another man, and he fired." The witness explained that instead of using the word man he employed an obscene expression meaning illicit sexual intercourse. When he fired, Mrs. Fisko's hand was up on the back door of the porch and she was facing the back door. The witness took the child and went out the front door. Before she got the front door unlocked, the second shot was fired. Mrs. Fisko was "facing the back door of the porch at the time." After she had notified some neighbors and was on her way back, the witness heard the third shot. On cross-examination the witness testified that appellant made no threats and did not indicate that he was going to murder or hurt his wife, but, "just said she was crooked and no good."

Emma Rice was the only witness to the shooting. Her daughter-in-law, Lois Rice, who left the house shortly after the appellant returned, testified in substance that when she returned to the house from taking some things away she saw appellant in the living room and he was mumbling and "cussing" a little. He then went outside and coming back in asked her mother (Mrs. Fisko): "Where is my gun?" Her mother said: "It is out where it always is," and gestured towards the closet-way to the cellar. He went out there and looked and then went off in the car. He was not drunk.

Marie Swanson testified that on the night of the 17th of February 1936, she came home at about 11 o'clock at night and her mother told her that appellant was in the front bedroom. About the middle of the night he started in swearing and making a lot of noise. Mrs. Fisko said she would go in and calm him. She went in and the witness went to sleep. In the middle of the night she woke up and heard him swearing. He was in a very angry mood. "He said that nobody would take his baby away from him, he would kill them first." The witness further testified that on the afternoon of February 20th when she came home from school she saw appellant in the living room. He was swearing. She further testified that three or four days after her mother and appellant separated she heard her tell him at the home on Bell street, "that he had had his last chance and that she was going to live at a place she hadn't had, the Humboldt Apartments; then said she was going to live over there and that she would give him the divorce."

Joseph L. Kirkley, a police officer, who was called to the scene of the shooting, testified that he found appellant lying on the floor of the living room with a rifle beside him, and the body of Mrs. Fisko on the back porch near the back door. There was a bottle of whisky partly filled on the floor of the living room.

Mrs. Bertha Wilkinson, superintendent of nurses at the Washoe General Hospital, testified that appellant was brought there on February 20, 1936, suffering from

a gunshot wound on the side of the face. She assisted in removing his clothes and personal effects. Among these personal effects was a check for $10 drawn in his favor on the First and Virginia Branch, First National Bank, Reno, Nevada, by Marie Fisko.

Appellant testified that he had been drinking intoxicating liquor for twelve or thirteen years; that he got drunk often, nearly every day; that during the past three years he consumed a quart or two of whisky every day. He testified that he and his wife had not separated, and denied that he made the statement that he would kill anybody who tried to take his baby away from him. As to February 20th, he testified that after getting up in the morning he drove to the home of Mrs. Thomas and that he did not remember anything that happened after that; that he had been drinking the night before and had a pint in his car when he went to the home of Mrs. Thomas. He thought he drank it all.

There was other testimony on the part of the defense as to his habit of drinking and of his being under the influence of liquor on the day of the homicide.

The above statement of the evidence is not exhaustive, but none is omitted that has any bearing upon the issue of manslaughter sought to be raised. We find none that tends in any degree to raise that issue. Section 10069 N. C. L. provides in part:

"Manslaughter is the unlawful killing of a human being, without malice express or implied, and without any mixture of deliberation."

Section 10070 N. C. L. provides:

"In cases of voluntary manslaughter, there must be a serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury on the person killing."

Section 10071 N. C. L. provides:

"The killing must be the result of that sudden violent

impulse of passion supposed to be irresistible; for, if there should appear to have been an interval between the assault or provocation given and the killing, sufficient for the voice of reason and humanity to be heard, the killing shall be attributed to deliberate revenge, and punished as murder."

It is claimed that the deceased committed an assault and battery upon appellant immediately prior to the shooting, by throwing her arms around his neck, and that that was evidence tending to prove manslaughter. The evidence strongly points to the lawfulness of the act because apparently induced by fear for her safety and the safety of her child. His inquiry for his gun and satisfying himself where it was, his angry mood, his drinking, his suddenly seizing the loaded rifle and following her from the kitchen to the living room, were circumstances giving cause for such apprehension. But conceding, without deciding, the act to have been technically an assault and battery, we cannot attribute it to such probative effect as being of a character likely to excite, in a reasonable person, an irresistible impulse to kill. We think it unreasonable to consider it so serious and highly provoking as that. Presumptively the killing was murder. Section 10081 N. C. L. Neither slight provocation nor an assault of a trivial nature will reduce a homicide from murder to manslaughter. State v. Anderson, 4 Nev. 265; 2 Bish. Cr. Law (9th ed.), p. 535. No personal injury was inflicted or attempted to be inflicted upon him. The woman held him but a second or two and then fled fearfully, the event proving her fears to have been well founded. Being his wife and the mother of his child made a situation quite different that if one not so intimately related had by the act attempted to injure him or put an indignity upon him. 2 Bish. Cr. Law (9th ed.), p. 535. Moreover, appellant in effect disclaimed any heat of passion by testifying that he had no knowledge whatever of the affair; and that his mind was so clouded with drink that he

remembered nothing of what he did after his visit to the home of Mrs. Thomas in the morning.

We have examined all of the cases presented in the briefs holding that it was error to refuse instructions on manslaughter in trials for murder, and find none as destitute of evidence tending to prove the former offense as the instant case. To refer to them in detail and point out the difference would prolong this opinion unnecessarily. In each there was evidence which made it proper to submit the issue of manslaughter to the jury. The cases of State v. Frazer, 14 Nev. 210; State v. Salgado, 38 Nev. 413, 150 P. 764; State v. Green, 45 Nev. 297, 202 P. 368, cited by appellant, contain no ruling bearing on the question.

■ Appellant contends that the evidence as to his drinking for a number of years and of his intoxication on the day of the shooting, to the extent that he remembered nothing of it, tended to reduce the offense of murder charged to manslaughter. Certainly it had no such tendency as to voluntary manslaughter, and we think it had no such probative effect as to involuntary manslaughter.

■ By the law of this state, no act committed by a person while in a state of voluntary intoxication is less criminal on this account, saving that when the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the circumstances of such intoxication may be considered in determining the fact whether or not that particular purpose, motive, or intent was present. Section 9966 N. C. L. Assuming that the evidence of intoxication showed that he had no intent to kill, it did not tend to prove involuntary manslaughter, because the killing happened in the commission of an unlawful act, which, in its consequences naturally tended to destroy the life of a human being. Involuntary manslaughter is thus defined in our law:

"Involuntary manslaughter shall consist in the killing

of a human being, without any intent so to do, in the commission of an unlawful act, or a lawful act which probably might produce such a consequence in an unlawful manner; provided, that where such involuntary killing shall happen in the commission of an unlawful act, which, in its consequences, naturally tends to destroy the life of a human being, or is committed in the prosecution of a felonious intent, the offense shall be deemed and adjudged to be murder." Comp. Laws sec. 10072.

■ Under this statute the killing of the woman by the means employed was murder, even though there was no conscious intent to kill. Malice is implied from the unlawful use of the deadly weapon. Consequently, the evidence as to his condition, due to intoxication, was immaterial, except as to whether the killing was willful, deliberate, and premeditated, and this issue was resolved against him by the verdict of the jury.

■ While the authorities are not all agreed, the great weight thereof in this country is to the effect that mere intoxication cannot reduce murder to manslaughter. Weakley v. State, 168 Ark. 1087, 273 S. W. 374; Com. v. Soaris, 275 Mass. 291, 175 N. E. 491; State v. Aragon, 35 N. M. 198, 292 P. 225; Gills v. Com., 141 Va. 445, 126 S. E. 51; Note, 12 A. L. R. p. 888, et seq.; 13 Cal. Jur. p. 623; Bishop on Criminal Law (9th ed.), p. 296, sec. 401. Harris v. Commonwealth, 183 Ky. 542, 209 S. W. 509; People v. Nichol, 34 Cal. 211, 215. In People v. Nichol, supra, it was held:

"As between murder in the second degree and manslaughter, the drunkenness of the offender can form no legitimate matter of inquiry, for manslaughter is the unlawful killing of a human being, without malice, express or implied, and without any mixture of deliberation."

This decision was approved in People v. Langton, 67 Cal. 427, 7 P. 843, and adhered to in People v. Conte, 17 Cal. App. 771, 122 P. 450, 457.

This court has heretofore virtually determined that

evidence of drunkenness is not admissible to reduce murder to manslaughter. In State v. Johnny, supra, in which one of the defendants testified that he did not know much about what happened; that he was too drunk to remember; that he remembered holding the murdered man's hand, and helping to place him on the fire, but further than that he had no recollection of the occurrence whatever, the court held there was no evidence tending to reduce the offense to manslaughter. Moreover, the court in that case approved an instruction which included this statement:

"* * * evidence of drunkenness is admissible solely with reference to the question of premeditation, or where there is evidence tending to show that a murder has been committed in the perpetration or attempt to perpetrate a robbery, as to the question of the existence of the felonious intent to steal which is an essential element of robbery."

We think it proper to say, in conclusion of this subject, that if the rule that drunkenness is no legitimate matter of inquiry as between murder in the second degree and manslaughter were otherwise, the appellant would not have been prejudiced by the court's refusal to instruct on manslaughter, because he was found guilty of murder of the first degree, and the penalty fixed at death.

■ There is no merit in the assignment of error as to the refusal to give the jury a form of verdict on manslaughter. This is apparent alone from our view that the refusal to give instructions on manslaughter was not error.

■ It is next contended that evidence of mental deterioration and insanity required the giving of instructions on manslaughter. We are of the opinion that such evidence was in no way relevant to reduce the homicide to manslaughter. If by reason of insanity appellant did not know the nature and quality of his act, and that it was wrong, he was absolved from all guilt; otherwise

in whatever lesser degree his mind may have been affected by drink or, other cause, he is amenable to punishment as one of normal mind. Evidence tending to prove any such lesser degree is pertinent to no issue. There is no middle ground. Foster v. State, 37 Ariz. 281, 294 P. 268, 269. See Harris v. Commonwealth, 183 Ky. 542, 209 S. W. 509. This court, in State v. Thompson, 12 Nev. 140, approved the following doctrine:

"It is, therefore, a legal doctrine, applicable in ordinary cases, that voluntary intoxication furnishes no excuse for crime committed under its influence. It is so, even, when the intoxication is so extreme as to make the person unconscious of what he is doing or to create a temporary insanity." Bishop's Criminal Law, sec. 400.

█ On the issue of insanity there was testimony pro and con. One witness for appellant, a physician, testified that in his opinion he was insane. Another expert witness on the part of the state testified that he was sane. There was some nonexpert testimony on each side of this issue. The court fairly instructed the jury on the law of this defense. Their verdict therefore cannot be disturbed on such ground.

█ The failure of the court to submit to the jury a form of verdict of not guilty by reason of insanity is assigned as error. No duty was imposed upon the court to give such form of verdict. Moreover, it does not appear that counsel requested the giving of such a form. If they considered its giving of any importance whatever, it was their duty, as stated in State v. St. Clair, 16 Nev. 207, to have prepared it, or have requested the court to give it.

Appellant complains of an instruction defining murder of the first and second degree, and making clear the distinction between these degrees. The language, thought erroneous and harmful, is that employed with reference to murder of the first degree by which it is said:

"There need be no appreciable space of time between the intention to kill and the act of killing; they may be as instantaneous as the successive thoughts of the mind."

■ The objection here urged, as we understand it, is that said language was calculated to mislead the jury into believing that the intent to kill need not be formed anterior to the act of killing to constitute murder of the first degree. We apprehend no such tendency. The instruction does not say that no space of time need intervene between the intention and act, and the thought intended to be conveyed is made clear by the statements immediately preceding:

"The intent to kill * * * must be formed upon a pre-existing reflection. * * *"

And immediately following:

"They may be as instantaneous as successive thoughts of the mind. It is only necessary that the act of killing be preceded by a concurrence of will, deliberation and premeditation on the part of the slayer."

The instruction as given in the instant case is set out in full in our decision in State v. Randolph, 49 Nev. 241, 242 P. 697, and approved. It was there pointed out that a similar instruction given in the case of State v. Harris, 12 Nev. 414, though criticized as to a portion, was not held erroneous, and that the instruction under consideration had been drawn to meet that criticism. It will be seen by a reference to the latter case that the instruction was not there criticized as to the language complained of here, but as to that which it was thought would be more likely in some cases to prejudice the state than any defendant.

The instruction assailed was lastly approved by this court in State v. Williams, 50 Nev. 271, 257 P. 619. It is the established law of this state, and we are not impressed with the principles stated in State v. Anselmo, 46 Utah 137, 148 P. 1071, and State v. Stenback, 78 Utah 350, 2 P. (2d) 1050, 79 A. L. R. 878, as reasons for the contrary rule announced in those cases.

We have carefully considered the case. There is no error in the record. The evidence,. which the jury apparently believed, reveals a case typical of a large class. A woman leaves, or prepares to leave, her husband; he drinks intoxicating liquor; makes threats; arms himself with a deadly weapon; seeks her out and slays her. The evidence supports the verdict and judgment.

The judgment and order appealed from are affirmed, and the district court is directed to make a proper order for the carrying into effect by the warden of the state prison the judgment rendered.

### On Petition for Rehearing

September 3, 1937.                    70 P.(2d) 1119.

Rehearing denied.

## OPINION

By the Court, DUCKER, J.:

A petition for a rehearing has been presented in which it is claimed that this court overlooked evidence that tended to prove manslaughter, requiring a submission of that issue to the jury.

The evidence claimed to have been disregarded is said to be the choking of the appellant by Mrs. Fisko when she threw her arms around his neck, and the great disparity in weight between the husband and wife.

13. It appears from the testimony that appellant weighed one hundred and forty pounds, and the deceased two hundred and seventy-five pounds. We did not state the fact of this disparity in our opinion because we considered it irrelevant. It does not follow that there was any disparity in strength, and if we should enter the field of presumptions, the greater strength would be attributed to the appellant. However, the relative strength or weight of the two is of no evidentiary value in this case. If the appellant had claimed self-defense,

it might be otherwise. But the theory that the difference in weight was a contributing factor to the killing in an overmastering heat of passion borders on the absurd.

There is no evidence showing that Mrs. Fisko choked appellant when she threw her arms around his neck.

A rehearing is denied.