137 Nev., Advance Opinion 16

IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| ABEBAW TESFAYE KASSA,<br>Appellant,<br>vs.<br>THE STATE OF NEVADA,<br>Respondent. | No. 76870<br><br>**FILED**<br><br>APR 2 9 2021<br><br>ELIZABETH A. BROWN<br>CLERK OF SUPREME COURT<br>BY S. Young<br>DEPUTY CLERK |

Appeal from a judgment of conviction, pursuant to a jury verdict, finding appellant guilty but mentally ill on charges of first-degree murder and first-degree arson. Eighth Judicial District Court, Clark County; Michelle Leavitt, Judge.

*Affirmed.*

Marchese Law Office and Jess R. Marchese, Las Vegas,
for Appellant.

Aaron D. Ford, Attorney General, Carson City; Steven B. Wolfson, District Attorney, and David L. Stanton and Charles W. Thoman, Chief Deputy District Attorneys, Clark County,
for Respondent.

BEFORE THE COURT EN BANC.

*OPINION*

By the Court, PICKERING, J.:

A jury found appellant Abebaw Tesfaye Kassa guilty but mentally ill on charges of first-degree felony murder and first-degree arson. Kassa contests the validity of his convictions on the basis that the district

court misinstructed the jury on voluntary intoxication, and otherwise erred by denying his motion to vacate the jury's guilty verdict and find him not guilty by reason of insanity. But there is sufficient evidence in the record to support Kassa's convictions, and we disagree that the district court abused its discretion in giving the challenged instruction. Accordingly, we affirm.

## I.

Early one morning in 2016, Kassa set fire to the transitional home for persons with mental illness where he had been living without incident for just over a month. Kassa's fellow residents escaped, but the housekeeper, Lolita Budiao, was badly burned and died several days later. Kassa had delayed Budiao's escape by deliberately trapping her in a bathroom while the fire engulfed the home. Kassa himself fled, without injury, through a window as law enforcement arrived at the scene. He tried to run from the officers and resisted arrest when they ultimately caught and restrained him.

The State charged Kassa with first-degree felony murder and first-degree arson. At trial, Kassa admitted setting the fire and causing Budiao's death. But he raised, as an affirmative defense, his alleged legal insanity at the time. Specifically, Kassa alleged that he was suffering from schizophrenic auditory hallucinations when he set the fire—voices were telling him that he had died in a car accident five years prior, that his body was being kept breathing and used by others for nefarious purposes, and that he needed to set and burn in the fire to end his exploitation. Kassa introduced expert testimony by two psychiatrists who had examined him in the years since the fire to support this defense.

The State countered the defense experts by introducing medical records of Kassa, noting statements he made to the medical care providers

attending him shortly after the fire. These records reflect that at that time—notably, prior to Budiao's death, when the prospect of murder charges arose—Kassa reported that before the fire he had been snorting "Spice," a synthetic version of marijuana with wide-ranging and potentially hallucinogenic effects. He also reported on the intoxicating mental effects from his use of the Spice, stating that this drug use left him "feeling disturbed and unable to sleep." Based in part on this evidence, the State proposed jury instruction no. 20 regarding voluntary intoxication, which advised jurors that voluntary intoxication—in contrast to a mental disease or defect—did not render any resulting conduct "less criminal." The instruction further advised that this was so even where "the intoxication is so extreme as to make the person unconscious of what he is doing or to create a temporary insanity." The district court provided this instruction over Kassa's objection.

The jury found Kassa guilty but mentally ill (GBMI) on both counts. NRS 175.533 allows a jury to find a defendant GBMI when the jury finds the defendant guilty beyond a reasonable doubt of the offense, and that "due to a disease or defect of the mind, the defendant was mentally ill at the time of the commission of the offense," though falling short of the demanding legal insanity standard that would support a verdict of not guilty by reason of insanity (NGRI). With such a finding, the jury determines that a defendant's mental illness does not excuse his or her criminal conduct; accordingly, the result is not an acquittal, but a guilty verdict that signals certain allowances in sentencing. *See Finger v. State*, 117 Nev. 548, 554, 27 P.3d 66, 70 (2001) (noting that with a GBMI verdict, "the district court may suggest that the prison system provide certain types of treatment to the convicted individual").

Kassa moved the district court to vacate the GBMI verdicts and find him not guilty by reason of insanity. Following a hearing, the district court denied the motion. The district court sentenced Kassa to serve concurrent prison terms totaling 20 years to life in the aggregate. This appeal followed.

## II.

At trial, Kassa conceded that he intentionally started a fire; that he intended that fire to cause death; that he started that fire with knowledge that others were in the home; that he held Budiao captive in a bathroom to prevent her from escaping or extinguishing the fire; and that Budiao died as a result. And even beyond Kassa's admissions, the State presented testimony from multiple eyewitnesses supporting the State's factual account. From this testimony, the jury could have reasonably inferred Kassa's intent to commit the crimes as charged. The crux of the case below was therefore not whether Kassa committed the acts the State alleged, with the intent to cause harm, but whether his conduct was excused from criminal liability based on an NGRI defense. See Finger v. State, 117 Nev. at 568, 27 P.3d at 80 (stating that "'legal insanity' simply means that a person has a complete defense to a criminal act").

For Kassa's alleged insanity to give him a complete defense to the charged crimes, his condition must satisfy the specific and demanding M'Naghten test—that is, "[d]ue to a disease or defect of the mind," he suffered from delusions such that he did not "(1) [k]now or understand the nature and capacity of his . . . act; or (2) [a]ppreciate that his or her conduct was wrong." NRS 174.035(6)(b); see Finger, 117 Nev. at 556-57, 27 P.3d at 72-73 (discussing M'Naghten's Case, 8 Eng. Rep. 718, 722, 10 Cl. & Fin. 200, 209-10 (1843), and describing the resulting test). Following his conviction, Kassa moved the district court for a judgment of acquittal pursuant to NRS

175.381(2), based on his supposed satisfaction of *M'Naghten*. But NRS 175.381(2) sets a high bar—if the record contains evidence on which any rational juror might convict, then its demanding standard is not met, *Purcell v. State*, 110 Nev. 1389, 1394, 887 P.2d 276, 279 (1994)—that the district court found Kassa failed to clear.

De novo review applies to an appeal from an order denying a motion for a judgment of acquittal, insofar as the appellate court must determine whether the district court applied the correct legal standard in deciding the motion. *Evans v. State*, 112 Nev. 1172, 1193, 926 P.2d 265, 279 (1996); *see United States v. Gagarin*, 950 F.3d 596, 602 (9th Cir. 2020) (noting that the court reviews de novo a denial of a motion for acquittal under analogous Fed. R. Crim. P. 29). However, the Seventh Circuit Court of Appeals has rightly assessed that, phrased in these terms, "this standard of review is slightly deceiving." *United States v. Johns*, 686 F.3d 438, 446 (7th Cir. 2012). Because the district court decides a motion for a judgment of acquittal under NRS 175.381(2) based on a sufficiency of the evidence standard, *Purcell*, 110 Nev. at 1394, 887 P.2d at 279; *see Evans*, 112 Nev. at 1193, 926 P.2d at 279, appellate review of an order denying such a motion "is in essence the same as a review of the sufficiency of the evidence." *Johns*, 686 F.3d at 446. Accordingly, Kassa's path to reversal is onerous.

A.

The record supports the district court's decision: A reasonable juror could have looked at the evidence and concluded that Kassa did not satisfy *M'Naghten*. Foremost, as the jury instructions emphasized, whether or not Kassa suffers from a mental illness, the State's case still benefits from an initial presumption of his *legal sanity*—it was Kassa's burden to rebut this by a preponderance of the evidence. NRS 174.035(6); *see Clark v. State*, 95 Nev. 24, 26, 588 P.2d 1027, 1028 (1979). And "[t]he presumption

Supreme Court
OF
Nevada

(O) 1947A

5

of [legal] sanity operates most critically, of course, at the time the offense is committed." *Ford v. State*, 102 Nev. 126, 135, 717 P.2d 27, 33 (1986). Accordingly, while the State did not deny the proffered evidence of Kassa's history of delusions and hallucination, neither this nor his psychiatric diagnosis established his legal insanity for the purposes of his NGRI defense—the *M'Naghten* test hinges on the temporal and causal connection between Kassa's mental illness and the crime. *Id.* at 136, 717 P.2d at 33.

Had the jury credited the testimony of Kassa's two psychiatrists, an NGRI verdict might have been reached.[1] But as Kassa conceded at oral argument before this court, the jury was under no obligation to accept the experts' testimony. And circumstances here likely led the jury to be somewhat skeptical. As a foundational matter, two years after the fire—and long after he was charged with arson and murder— Kassa denied to the testifying psychiatric experts that he had used drugs before committing the crime. But in opening and closing arguments, the State noted that medical records made two days after the fire—records that Kassa stipulated to admitting at trial, which his experts confirmed the existence and contents of during their testimony, and which he did not include in his appellate record[2]—reflect that while in the hospital after the fire Kassa "gives a . . . detailed account of using . . . Spice, via snorting it." It appears that those nearly contemporaneous records additionally stated

---

[1]Though, for the reasons discussed below, a reasonable juror could have accepted the expert testimony in whole and still rejected Kassa's NGRI defense.

[2]Where records are missing from the appellate record, we presume the materials support the district court's decision. *See Sasser v. State*, 130 Nev. 387, 393 & n.8, 324 P.3d 1221, 1225 & n.8 (2014).

that, "Patient reports he had recently been snorting Spice. Reports it was a powder-like substance and that he had a history of using this in the past as well. . . . [H]e reports feeling disturbed and unable to sleep after snorting it . . . ."

A reasonable juror could have elevated these medical records—made shortly after the fire, before Budiao died, without any ulterior investigative purpose, and before serious criminal charges were brought—over the testifying expert opinions, based as they were on self-serving information Kassa supplied two years after the event. *See Clark*, 95 Nev. at 28, 588 P.2d at 1029-30 (finding that the jury reasonably rejected an NGRI defense where "[t]he expert opinions were largely based on information supplied to the psychiatrists by appellant over a year subsequent to the commission of the crime, which information was markedly sharp in contrast to statements given police more proximate to [the crime]"). This is especially so given that Kassa's own expert agreed that, based on his review of the records noted above, he "could not rule out the use of Spice at the time" Kassa set the fire. And to the extent the jury reasonably believed that Kassa's ingestion of Spice created his alleged delusion or otherwise led to his admitted arson, they likewise correctly rejected his NGRI defense—*M'Naghten's* causal requirement, that the operative delusion result from a "mental disease or defect," would not be satisfied under such conditions. *State v. Fisko*, 58 Nev. 65, 79, 70 P.2d 1113, 1118 (1937) (stating that "voluntary intoxication furnishes no excuse for crime committed under its influence") (quoting 1 Joel Prentiss Bishop, *Commentaries on the Criminal Law* § 400 (7th ed. 1882)), *overruled in part on other grounds by Fox v. State*, 73 Nev. 241, 316 P.2d 924 (1957); *see* NRS 174.035(10)(a) (stating that an exonerating "[d]isease or defect of the mind"

SUPREME COURT
OF
NEVADA

(0) 1947A

7

for purposes of Nevada's *M'Naghten* test "does not include a disease or defect which is caused solely by voluntary intoxication").

## B.

All this said, there is no need to rely on the record evidence of Kassa's Spice use to support the jury's verdict. Sufficient evidence alternatively supports that Kassa fell short of *M'Naghten* in any case. *Cf. Rhyne v. State*, 118 Nev. 1, 10, 38 P.3d 163, 169 (2002) (noting "that a jury may return a general guilty verdict on an indictment charging several acts in the alternative even if one of the possible bases of conviction is unsupported by sufficient evidence"). *M'Naghten* sets "a very narrow standard." *Finger*, 117 Nev. at 577, 27 P.3d at 85. Under *M'Naghten*, "[d]elusional beliefs can only be the grounds for legal insanity when the facts of the delusion, if true, would justify the commission of the criminal act." *Id.* And, even accepting at face value that Kassa suffered under the delusions he claimed, and that they were caused by a defect of the mind rather than substance abuse, a reasonable juror could have determined that they did not meet this exacting requirement.

Of note, Kassa presented somewhat conflicting testimony as to the content of his delusions. One psychiatrist reported that Kassa said he lit the fire "to die fully" and end outside control of his reanimated body, while the other suggested that those same outside forces had directed him to set the fire. But in either case, with regard to the first part of the *M'Naghten* test, there is substantial record support for the inference that Kassa understood "the nature and capacity of his . . . act," NRS 174.035(6)(b)(1). Kassa knew that he was setting a fire, adding "clothing and furniture, a chair and possibly something from the sofa" as kindling, and that this would cause the home he and others lived in to burn. Indeed, his purpose in setting the fire was that it be deadly. It is therefore

Supreme Court
OF
Nevada

(O) 1947A

8

unsurprising that one of Kassa's own psychiatric experts testified that Kassa failed to "show impairment in this sub element" because he "knew that fires burned" and believed that he "required a fire that would burn his body." This alone would justify the jury in rejecting Kassa's NGRI defense under the first *M'Naghten* pathway. *See Buford v. State*, 793 S.E.2d 91, 94 (Ga. 2016) (holding that evidence was sufficient to support rejection of defendant's NGRI defense where one of two testifying experts was uncertain as to whether the defendant met the test's requirements).

As to the second part of the *M'Naghten* test, a jury could have also inferred that Kassa appreciated that his conduct was wrongful. Most notably, Kassa trapped Budiao in the bathroom, despite her screaming pleas to be released, specifically because he knew she would stop him and extinguish the fire. Beyond this, as Kassa's own testifying expert noted, Kassa escaped from the burning house through a window, then resisted arrest. Though one of Kassa's experts suggested that he escaped the fire when the smell of smoke triggered some sort of survival reflex in him, a reasonable jury still could infer Kassa's appreciation of wrongfulness from these facts. *See Edwards v. State*, 90 Nev. 255, 260, 524 P.2d 328, 332 (1974) (noting that an attempt to flee the scene of a crime "is a circumstance supportive of an inference of guilt").

Accordingly, even if the jury believed that Kassa had the delusions either of his psychiatrists described, and even if they believed those delusions were caused by a "defect of the mind," NRS 174.035(10)(a), and not Spice use, the evidence demonstrates that Kassa knew that he was setting a house on fire, the house was occupied by others, and the occupants would want to stop him. He likewise knew enough to escape from the fire and to attempt to evade arrest. And more fundamentally, neither his

delusional need "to die fully" nor his need to satisfy certain unnamed external forces controlling him amount to a *legal defense* for his intentionally starting a deadly fire, in the early morning, in a dwelling occupied by sleeping individuals who were, even in the context of his delusion, completely innocent. *See Finger*, 117 Nev. at 576, 27 P.3d at 85 (explaining that defendant is entitled to acquittal under the *M'Naghten* test only "if the facts as he believed them to be in his delusional state would justify his actions"). Accordingly, any suggestion that the testimony by Kassa's experts necessitated his acquittal is misdirected: "Even when experts are unanimous in their opinion," which was not the case here, "the factfinder may discredit their testimony—or disregard it altogether—and rely instead on other probative evidence from which to infer the defendant's sanity." 2 Catherine Palo, *Criminal Law Defenses* § 173 (Supp. 2020); *see also Clark*, 95 Nev. at 28, 588 P.2d at 1029 (noting that expert "testimony is not binding on the trier of fact, and the jury was entitled to believe or disbelieve the expert witnesses"). The district court did not err by denying Kassa's motion for acquittal.

## III.

Kassa's second argument in favor of reversal centers on jury instruction no. 20, and specifically the insertion of the second sentence therein:

> No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his condition. *This is so even when the intoxication is so extreme as to make the person unconscious of what he is doing or to create a temporary insanity.* But whenever the actual existence of any particular purpose, motive or intent is a necessary element to constitute a particular species or degree of crime, evidence of

SUPREME COURT
OF
NEVADA

(O) 1947A

10

intoxication may be taken into consideration in determining such purpose, motive or intent.

(Emphasis added.) This instruction is based in large part on NRS 193.220; the additional language regarding the interplay between voluntary intoxication and NGRI defenses is from *Fisko*, 58 Nev. at 79, 70 P.2d at 1118.

Generally, "[t]he district court has broad discretion to settle jury instructions, and this court reviews the district court's decision for an abuse of that discretion or judicial error." *Newson v. State*, 136 Nev. 181, 185, 462 P.3d 246, 249-50 (2020) (internal quotation marks omitted). That said, "we review de novo whether a particular instruction . . . comprises a correct statement of the law." *Hager v. State*, 135 Nev. 246, 257, 447 P.3d 1063, 1072 (2019) (alterations and internal quotation marks omitted). And even if an instruction is given in error, reversal is not required unless a different result would be likely, absent the contested instruction. *See Allred v. State*, 120 Nev. 410, 416, 92 P.3d 1246, 1251 (2004).

The substance of Kassa's objection is somewhat unclear. To the extent he suggests that a court may never allow jury instructions that vary from the applicable statutory language, this is untenable. *See Runion v. State*, 116 Nev. 1041, 1050-51, 13 P.3d 52, 58-59 (2000) (admonishing district courts to tailor instructions to the case, rather than merely quote applicable statutes). Kassa also seems to argue that the district court should not have permitted any instruction regarding voluntary intoxication and its impact on an NGRI defense. But this ignores that he raised no objection—even on appeal—to instructions no. 14 (instructing that in the NGRI context, "[v]oluntary use of drugs or alcohol do not constitute a severe mental disease or defect. The voluntary use of drugs or alcohol must be disregarded.") and 17 (instructing that a "'[d]isease or defect of the mind'

SUPREME COURT
OF
NEVADA

(O) 1947A

11

does not include a disease or defect which is caused solely by voluntary intoxication"). These cover the same subject matter as instruction no. 20.

In any case, Kassa could not demonstrate any prejudice from the district court's inclusion of these instructions, such that reversal would be justified. *See Allred v. State*, 120 Nev. 410, 416, 92 P.3d 1246, 1251 (2004). Indeed, these instructions actually opened an additional avenue by which the jury might have acquitted him, had his attorney so argued the alleged facts. Arson, which also served as the basis for the State's felony murder charge, is a specific intent crime, *see Ewish v. State*, 110 Nev. 221, 228, 871 P.2d 306, 311 (1994), *on reh'g*, 111 Nev. 1365, 904 P.2d 1038 (1995), and voluntary intoxication can defeat specific intent, *see* NRS 193.220.

Kassa may also have intended to object to instruction no. 20 on the grounds that its use of the phrase "temporary insanity" was prejudicially confusing. It is true that NGRI defenses only require that the defendant be legally insane at the moment of the offense; that is, it has no bearing whether the alleged insanity was temporary or long-running. But instruction no. 20 only integrates related and correct statements of law. *See* NRS 193.220; *Fisko*, 58 Nev. at 79, 70 P.2d at 1118. And in any case, reading the instructions as a whole, *Tanksley v. State*, 113 Nev. 844, 849, 944 P.2d 240, 243 (1997), it is clear that the concepts instruction no. 20 distinguishes are that of a causal mental disease or defect and voluntary intoxication, of which only the former will suffice for an acquittal under *M'Naghten*.

Indeed, in its closing argument to the jury, the State clearly made correct use of the language of instruction no. 20 (in conjunction with instructions no. 14 and 17):

> Now, what's the importance of the Spice . . . . In order to be [legally] insane, your

SUPREME COURT
OF
NEVADA

(O) 1947A

12

delusional mental state must be derived from the mental defect, here schizophrenia. It cannot be derived from the ingestion of alcohol and narcotics. Now, you could be absolutely insane and use drugs and alcohol, and that still is a legal defense for legal insanity, but the cause, where the conduct and the delusional state comes from must come from the mental illness and not from the Spice.

Accordingly, to the extent there was anything potentially confusing in instruction no. 20, the context of the related unobjected-to instructions and the State's explanation of the same offered sufficient clarification. *See Nunnery v. State*, 127 Nev. 749, 786, 263 P.3d 235, 259 (2011) (finding district court did not abuse its discretion in issuing particular jury instruction "[b]ecause three other instructions informed the jury that the State bore the burden of proof and the same need not be stated in every instruction").

Finally, Kassa argues that our statement in *Nevius v. State*—that "for a defendant to obtain an instruction on voluntary intoxication as negating specific intent, the evidence must show not only the defendant's consumption of intoxicants, but also the intoxicating effect of the substances imbibed and the resultant effect on the mental state pertinent to the proceedings," 101 Nev. 238, 249, 699 P.2d 1053, 1060 (1985)—in fairness should apply equally to the State. But whether or not Kassa is correct that *Nevius* can be logically extended to require a burden of production on the State in the odd instance that the State raises a theory of intoxication is beside the point. Here, the State satisfied this burden. As discussed above, Kassa stipulated to the admission of medical records reporting his statements to health care providers two days after the fire, in which Kassa admitted his Spice use and spoke of the unsettling, intoxicating effect that such use had on his mental state. Although Kassa did not include the

medical records as part of the record on appeal—an omission that weighs against his claim of evidentiary insufficiency, *see* note 2, *supra*—his expert also spoke to the intoxicating effects that Spice can have on a person's mental state, including causing a person to feel paranoid, hear voices, and have delusions and/or hallucinations. Kassa's experts further admitted they could not exclude Spice as a potential cause of his alleged delusions and noted the contents of his medical records stating the same. And in any case, as indicated above, Kassa raised no objection to instructions no. 14 and 17 on this basis, neither here nor in the district court. This would likewise operate to defeat this claim. *Cf. Gaxiola v. State*, 121 Nev. 638, 648, 119 P.3d 1225, 1232 (2005) (noting that "[g]enerally, the failure to clearly object on the record to a jury instruction precludes appellate review" (internal quotation marks omitted)).

      For these reasons, we affirm the judgment of the district court.

_____*Pickering*_____, J.
Pickering

We concur:

_____, J.
Parraguirre

_____, J.
Cadish

_____, J.
Herndon

SILVER, J., with whom HARDESTY, C.J., and STIGLICH, J., agree, dissenting:

I would reverse the judgment of conviction adjudicating appellant Abebaw Kassa guilty but mentally ill of first-degree murder and first-degree arson and remand the matter for a new trial. In my view, the district court abused its discretion by instructing the jury on voluntary intoxication because the State did not present sufficient evidence to warrant a voluntary intoxication instruction under *Nevius v. State*, 101 Nev. 238, 249, 699 P.2d 1053, 1060 (1985). And the district court compounded that error by giving a confusing and legally inaccurate form of the instruction (no. 20), as proposed by the State. Contrary to Nevada law, the challenged instruction implied that the jury could determine that Kassa was insane at the time of the offense but nevertheless find him criminally liable. *Cf.* NRS 194.010(4) (excepting from criminal liability "[p]ersons who committed the act charged or made the omission charged in a state of insanity"). Moreover, instruction no. 20 contradicted and conflicted with other instructions that addressed the relationship between intoxication and insanity (nos. 14 and 17). The majority correctly notes that our test for legal insanity is "specific and demanding," Majority Opinion at 4, which is exactly why this court has described insanity as "a term of art" and "stress[ed] the need for experts and juries to be correctly advised on the M'Naghten standard." *Finger v. State*, 117 Nev. 548, 577, 27 P.3d 66, 85 (2001). I believe the instructional error was not harmless, as these contradictory instructions likely confused the jury about a highly technical area of criminal law. Because the jury's deliberative process was inexorably tainted by the error, I respectfully dissent.

In 2016, Kassa lived in a community-based group home for individuals suffering from mental illness. The home specialized in assisting semi-independent individuals with their basic life skills, e.g., hygiene, nutrition, and compliance with medication needs. Kassa resided in the home for approximately one month without incident. During the early morning hours of July 27, 2016, Kassa started a fire in the home that claimed the life of the live-in caretaker. The State charged Kassa with first-degree arson and felony murder. Kassa entered a plea of not guilty by reason of insanity (NGRI). To meet the standard of legal insanity, Kassa bore the burden of proving that, due to a mental defect or disease, he "was in a delusional state at the time of the alleged offense," NRS 174.035(6)(a), that resulted in his inability to "(1) [k]now or understand the nature and capacity of his . . . act; or (2) [a]ppreciate that his . . . conduct was wrong, meaning not authorized by law," NRS 174.035(6)(b).

Before trial, mental health evaluators assessed Kassa and determined he was psychotic and incompetent to stand trial. After approximately six months of treatment and antipsychotic medication in a maximum security forensic hospital, Kassa regained competence and proceeded to trial. The defense retained Dr. Gregory Brown to evaluate Kassa and provide expert psychiatric testimony at trial. Dr. Brown diagnosed Kassa as schizophrenic and concluded he was legally insane when he started the fire. After Kassa filed notice of his entry of an NGRI plea, the State requested and obtained an independent psychological evaluation of Kassa from Dr. Steven Zuchowski. After evaluating Kassa, Dr. Zuchowski likewise diagnosed Kassa with schizophrenia, concluded that he was legally insane when he set the fire, and testified for the defense at trial.

SUPREME COURT
OF
NEVADA

(O) 1947A

2

In discussing his conclusions, Dr. Brown explained that individuals with schizophrenia typically develop symptoms during their mid-to-late 20s, including disorganized thinking, sensory hallucinations that seem real, and delusions related to fixed-false beliefs. Mental health professionals first diagnosed Kassa as schizophrenic in 2011, and he reported experiencing auditory hallucinations since 2008. Dr. Brown detailed multiple schizophrenic episodes in Kassa's mental health history. In one incident, Kassa called 9-1-1 on himself because voices were telling him to hurt someone. Emergency responders found him lying in his bedroom closet and took him for a mental health evaluation. During another incident, emergency responders found Kassa screaming incoherently after voices told him that his mother died, though his mother was still alive. At one point, authorities involuntarily admitted Kassa to a mental health facility. During the inpatient admission, Kassa described other instances of hearing voices coming from a radio and hearing "heavenly things." Authorities determined Kassa was psychotic and treated him with antipsychotic medication. Dr. Brown found that Kassa's psychiatric history conformed to the diagnosis of schizophrenia and ruled out potential malingering.

Regarding Kassa's legal sanity at the time of the fire, Dr. Brown explained that Kassa suffered from two distinct delusions. First, Kassa believed that he died in a 2013 car accident because voices told him he had died and because he could not locate his pulse. Further, Kassa believed that he was unable to control his body because external forces were animating his dead body and making him breathe artificially. Kassa understood the concept of fire and believed it necessary to destroy his already dead body. Dr. Brown opined that this delusion prevented Kassa from understanding

SUPREME COURT
OF
NEVADA

(O) 1947A

that his actions were wrong. Ultimately, Dr. Brown concluded that Kassa's schizophrenia and delusional state when he started the fire met the NGRI standard.

Dr. Zuchowski, the State's handpicked psychiatrist, testified similarly, explaining that Kassa's mental health history conformed to a diagnosis of schizophrenia. And he concluded that Kassa suffered under a fixed-false belief that he was already dead and experienced "command-oriented hallucinations." Dr. Zuchowski described Kassa's belief that he was already dead and in heaven. While Dr. Zuchowski found that Kassa understood he was starting a fire, he concluded that Kassa did not understand that other people could be harmed or that the fire would have serious consequences. Accordingly, Dr. Zuchowski concluded that Kassa, in the depths of his psychotic delusion, did not appreciate the wrongfulness of his actions.

In the face of this overwhelming presentation of evidence that Kassa was legally insane when he started the fire—including from the State's chosen expert—the prosecution did not present any contrary expert testimony. Instead, the State focused on the idea that Kassa was intoxicated, not insane, at the time of the fire, pointing to a notation in the medical records about Kassa's use of Spice. However, Dr. Brown testified that nothing about the admitted medical records, including the notation about Spice usage, would change his conclusions. And Dr. Zuchowski did not see any evidence that drug use caused Kassa's psychotic episodes, concluding that the description of the event was consistent with the diagnosis of schizophrenia. But the State persisted in arguing that

> [Kassa is] claiming that he's insane, anything to rebut that, including extreme intoxication, including temporary insanity[,] . . . the State

> should be allowed to argue that if [Kassa is] intoxicated to the point where he's even temporarily insane he's[,] . . . and I hate to use a double negative, but he's not not guilty by reason of insanity.

This argument highlights the confusion created by the State commingling temporary insanity and voluntary intoxication with instruction no. 20. Kassa objected generally to giving any voluntary intoxication instruction. After the district court found the instruction proper, he further objected to the State's proposed injection of language that discussed voluntary intoxication causing a "temporary insanity," as it would confuse the jury.

This court has explained that, to warrant giving a voluntary intoxication instruction, "the evidence must show not only the defendant's consumption of intoxicants, but also the intoxicating effect of the substances imbibed and the resultant effect on the mental state pertinent to the proceedings." *Nevius*, 101 Nev. at 249, 699 P.2d at 1060. In *Nevius*, the defendant presented evidence that "showed only that he consumed intoxicants." *Id.* Specifically, "Nevius testified that the four men had a bottle of wine with them . . . and that [he] had smoked marijuana." *Id.* Because the defendant did not establish the intoxicating effect of the wine and marijuana, or the effect on his mental state as it related to the criminal charge, this court concluded the district court properly rejected the defendant's voluntary intoxication instruction. *Id.* While the majority does not conclude one way or the other, in my view, the law—and specifically the *Nevius* standard in this case—should apply equally to the State when it requests an instruction like the one given in this case. I also disagree with the majority that the State nevertheless "satisfied this burden." Maj. Op. at 13.

Here, the State did not even establish that Kassa consumed Spice. The State relied solely on a notation in Kassa's medical records and paraphrased it during closing arguments. Specifically, the State commented that "[Kassa] gives a pretty detailed account of using *some type of substance*, Spice, via snorting it. . . . Reports it was a powder-like substance and that he had a history of using this in the past as well. Then he reports feeling disturbed and unable to sleep after snorting it, *the substance he refers to as Spice*." (Emphases added.) Accordingly, Kassa admitted to using "some type of substance" that he called "Spice" and felt agitated and had trouble sleeping afterwards.

But this account of Kassa's alleged intoxication is problematic. First, the description "of using some type of substance" fails to show what substance, if any, Kassa actually ingested. Additionally, although the medical records referred to "Spice," Dr. Zuchowski posited that Kassa described being "anointed with some kind of an incense or perfume the day prior to the fire at church . . . and that may have been misinterpreted as Spice use."[1] Second, even assuming Kassa ingested Spice, the State presented no compelling evidence that established the intoxicating effects. Because Kassa suffered under a delusion that he was already dead and his body was animated by external forces, his description of "feeling disturbed and unable to sleep" sheds little light on his "mental state pertinent to the

---

[1]Kassa utilized a translator at trial. Dr. Brown testified that during his interview with Kassa—whose native language was Amharic, "a Semitic language that is an official language of Ethiopia," *Merriam-Webster's Collegiate Dictionary* 40 (11th ed. 2014)—he spoke "good English overall" but needed certain words repeated.

SUPREME COURT
OF
NEVADA

(O) 1947A

proceedings." *Nevius*, 101 Nev. at 249, 699 P.2d at 1060. Further, Dr. Brown explained that the substance can cause "widely differing effects on individuals" depending on the chemical makeup.[2] The effects range from feeling "mellow and relaxed" to causing paranoia and hallucinations. Thus, the State did not establish what, if any, substance Kassa consumed, the amount ingested, or how the effects he described related to the offense. Accordingly, I conclude that the district court abused its discretion by instructing the jury on voluntary intoxication.

Although I do not believe that a voluntary intoxication instruction should have been given at all, because one was given it should have, at the very least, correctly instructed the jury, particularly given that the instruction requested by the State referred to the highly technical NGRI defense. *See Finger*, 117 Nev. at 576-77, 27 P.3d at 85 (explaining that "[l]egal insanity has a precise and extremely narrow definition in Nevada law"). In my view, instruction no. 20 misstated the law, *see Nay v. State*, 123 Nev. 326, 330, 167 P.3d 430, 433 (2007) ("[W]hether a proffered instruction is a correct statement of the law presents a legal question which we review de novo."), and confused the "very narrow standard" that we apply to the insanity defense, *Finger*, 117 Nev. at 577, 27 P.3d at 85. Jury instruction no. 20 states the following:

---

[2]*See* Major Catherine L. Brantley, *Spice, Bath Salts, Salvia Divinorum, and Huffing: A Judge Advocate's Guide to Disposing of Designer Drug Cases in the Military*, 2012-Apr. Army Law. 15, 16 (2012) (explaining that "[Spice] produces euphoria, psychosis, respiratory problems, and low blood pressure; however, lower doses usually result in calming sensations"). Moreover, Kassa's description of ingesting Spice by snorting a powdered substance is dubious because "Spice is a green leafy substance that resembles marijuana. . . . [It] is comprised of a combination of different plant materials." *Id*. (defining Spice).

> No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his condition. *This is so even when the intoxication is so extreme as to make the person unconscious of what he is doing or to create a temporary insanity.* But whenever the actual existence of any particular purpose, motive or intent is a necessary element to constitute a particular species or degree of crime, evidence of intoxication may be taken into consideration in determining such purpose, motive or intent.

(Emphasis added.) I disagree with the majority that "instruction no. 20 only integrates related and correct statements of law." Maj. Op. at 12. Although the instruction largely tracks NRS 193.220,[3] the second sentence does not appear in that statute. The first and second sentence in the instruction, read together, imply that temporary insanity is not a defense. That is incorrect, as Nevada law allows the insanity defense to be based on insanity during a temporary interval of time, i.e., temporary insanity. NRS 174.035(6)(a) (requiring the defendant to prove he "was in a delusional state *at the time of the alleged offense*" (emphasis added)); *see also Miller v. State*, 112 Nev. 168, 174, 911 P.2d 1183, 1186-87 (1996) ("[A] person can benefit from the M'Naghten insanity defense if he shows he was insane during the

---

[3]NRS 193.220 explains the circumstances in which a jury may consider voluntary intoxication and the limits on its relevance:

> No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his or her condition, but whenever the actual existence of any particular purpose, motive or intent is a necessary element to constitute a particular species or degree of crime, the fact of the person's intoxication may be taken into consideration in determining the purpose, motive or intent.

temporal period that coincides with the time of the crime. Technically and semantically, such a finding is temporary insanity." (citation omitted)). The defense of temporary insanity reflects the fluid state of mental health. Put another way, a defendant can be legally sane before or after a criminal act and also legally insane at the time of the offense. *See Insanity, Black's Law Dictionary* (11th ed. 2019) (defining "temporary insanity" as "[i]nsanity that exists only at the time of a criminal act").

The record reflects that the State and the district court relied on *State v. Fisko*, 58 Nev. 65, 70 P.2d 1113 (1937), *overruled on other grounds by Fox v. State*, 73 Nev. 241, 247, 316 P.2d 924, 927 (1957), for the second sentence in the instruction. But that case conflated the defenses of temporary insanity and diminished capacity. *See id.* at 78-79, 70 P.2d at 1118 (describing defendant's diminished capacity defense based on voluntary intoxication as "temporary insanity" that "furnishes no excuse for [the] crime committed" (quoting 1 Joel Prentiss Bishop, *Commentaries on the Criminal Law* § 400 (7th ed. 1882))). As this court explained in *Miller*, 112 Nev. at 173-74, 911 P.2d at 1186-87, those defenses are mutually exclusive because diminished capacity can be present only in the absence of insanity whereas temporary insanity requires proof of insanity. *See Diminished Capacity, Black's Law Dictionary* (11th ed. 2019) (defining "diminished capacity" as "[a]n impaired mental condition—short of insanity—that is caused by intoxication, trauma, or disease and that prevents a person from having the mental state necessary to be held responsible for a crime"). The language that the State appropriated from *Fisko* also implies that intoxication alone can "create a temporary insanity." 58 Nev. at 79, 70 P.2d at 1118 (quoting Bishop, *supra*, § 400). But under Nevada law, voluntary intoxication cannot alone result in legal insanity,

temporary or not. *See* NRS 174.035(10)(a) ("'Disease or defect of the mind' [for purposes of the insanity defense] does not include a disease or defect which is caused solely by voluntary intoxication."). Accordingly, I believe the State's inclusion of language from an archaic treatise, published over 120 years before Nevada's codification of the *M'Naghten* standard, was contrary to Nevada law as it no longer comports with our contemporary insanity jurisprudence. I would therefore overrule *Fisko* to the extent it implies that voluntary intoxication alone can cause temporary insanity. Thus, I conclude that instructing the jury that "voluntary intoxication" can "create a temporary insanity" is an incorrect statement of the law and an abuse of discretion by the district court.

The question then is whether the instructional error was harmless. *See* NRS 178.598 ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."); *Nay*, 123 Nev. at 333-34, 167 P.3d at 435 (explaining that instructional errors generally are subject to harmless-error review). Here, the relationship between the insanity defense and voluntary intoxication was of critical importance because Kassa presented expert testimony that he was legally insane at the time of the crimes and the State contends that it presented evidence that Kassa ingested an intoxicating substance before the crimes. That relationship was concisely and clearly addressed in jury instruction no. 17, which followed an instruction explaining that the insanity defense requires proof of a disease or defect of the mind and quoted NRS 174.035(10)(a): "'Disease or defect of the mind' does not include a disease or defect which is caused solely by voluntary intoxication." But jury instruction no. 20 then muddied the waters, suggesting that voluntary intoxication on its own *could* give rise to temporary insanity while implying

that temporary insanity is not a defense. Unfortunately, none of the other instructions clarified the matter. In fact, another instruction (no. 14) compounded the potential for confusion by telling the jury that "[t]he voluntary use of drugs or alcohol must be disregarded in determining whether the defendant could appreciate the nature and quality of his acts or the moral wrongfulness of his acts." That instruction misstates the law and conflicts with the correct statement of the law set forth in jury instruction no. 17.[4] Under Nevada law, voluntary intoxication cannot be the *sole* cause of a mental disease or defect to support an insanity defense, but it may be a contributing factor for the jury to consider.

The jury thus was faced with internally inconsistent and confusing instructions. Indeed, one need only look to the State's comments in support of instruction no. 20 to see the problem: "the insanity—this case is confusing in and of itself." Or as the State told the jury, "You have the instructions. They're a little bit complicated . . . ." Yet the State chose to compound that confusion and further complicate the proceedings with its proffered instruction. We should not expect jurors "to be legal experts nor make legal inferences with respect to the meaning of the law; rather, they should be provided with applicable legal principles by accurate, clear, and complete instructions specifically tailored to the facts and circumstances of

---

[4]The majority correctly notes that Kassa did not object to instruction no. 14. But in my view, reading the instructions as a whole only clarifies the error in instruction no. 20, instead of curing it. *See Tanksley v. State*, 113 Nev. 844, 849, 944 P.2d 240, 243 (1997) (providing that "[t]aken as a whole, the jury instructions d[id] not cure" an erroneous instruction).

the case." *Crawford v. State*, 121 Nev. 744, 754, 121 P.3d 582, 588 (2005). This is particularly true where even the State found the case confusing.

Further, the majority isolates comments in the State's rebuttal argument that noted "[Kassa's] delusional mental state must be derived from the mental defect, here schizophrenia. It cannot be derived from the ingestion of alcohol and narcotics." Maj. Op. at 12-13.[5] But I believe the majority overrates the clarifying effect of this statement, as the State negated that principle by first telling the jury in closing argument, "You have an instruction [no. 20] that tells you that no act committed by a person while in a state of voluntary intoxication shall be deemed less . . . criminal by reason of his condition, and that's so, *even when the intoxication is so extreme as to cause temporary insanity*." (Emphasis added.) This statement encapsulates the flaw in instruction no. 20 and the resulting prejudice, i.e., that the jury could conclude that Kassa was both temporarily insane and criminally liable. *Cf. Finger*, 117 Nev. at 568, 27 P.3d at 80 (providing that "'legal insanity' simply means that a person has a complete defense to a

---

[5]In full, the State made the following comment:

> Now, what's the importance of the Spice? . . . In order to be [legally] insane, your delusional mental state must be derived from the mental defect, here schizophrenia. It cannot be derived from the ingestion of alcohol and narcotics. Now, you could be absolutely insane and use drugs and alcohol, and that still is a legal defense for legal insanity, but the cause, where the conduct and the delusional state comes from must come from the mental illness and not from the Spice.

criminal act based upon the person's inability to form the requisite criminal intent").

Finally, regarding the majority's position that the voluntary intoxication instruction actually benefited Kassa, I again disagree.[6] While "[i]t is true that voluntary intoxication may negate specific intent," *Nevius*, 101 Nev. at 249, 699 P.2d at 1060, it also opened up an avenue for the State to confuse the jury and persuade them to disregard the overwhelming, and one-sided, evidence of Kassa's legal insanity by instead focusing attention on the specter of Spice. This is reflected in the State's use of the term "Spice" 14 times during its closing and rebuttal arguments. Ultimately, under the circumstances presented here, I do not believe the error in giving jury instruction no. 20 was harmless beyond a reasonable doubt, as the erroneous emphasis on the alleged use of Spice certainly affected the jury's verdict. *See Miller*, 112 Nev. at 175, 911 P.2d at 1187 (reversing a conviction where the prosecution and district court misinterpreted the insanity defense and hopelessly confused the jury).

In sum, I conclude that the district court erred in giving a voluntary intoxication instruction and compounded that error by giving an instruction that misstated and confused the intricate and precise standard for legal insanity, thus making jury instruction no. 20 more injurious than instructive. Further, I conclude the error likely affected the jury's verdict

---

[6]To the extent the majority suggests Kassa could have argued a specific-intent defense to arson, the district court appeared to preclude such an argument. While discussing jury instruction no. 20, Kassa commented that if the State proves voluntary intoxication, "that vitiates the specific intent. There's no arson. There's no felony murder." In response, the district court stated, "No. . . . See you put his sanity at issue. . . . [S]o intoxication would negate the sanity issue, and since you put his sanity at issue, I think [the instruction is] appropriate . . . ."

and therefore was not harmless beyond a reasonable doubt. Accordingly, I would reverse the judgment of conviction and remand for a new trial based on the instructional error.

_____, J.
Silver

We concur:

_____, C.J.
Hardesty

_____, J.
Stiglich